[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 930 
Leon Baker appeals from a judgment entered pursuant to a jury verdict for J.R. Bennett and his wife Laura Jean Bennett.
The Bennetts sued Baker, a tax attorney from New York; S. David Johnston, their personal accountant; and Johnston's accounting firm, alleging conspiracy to defraud, negligence, and malpractice. The Bennetts claimed that the defendants had fraudulently induced them to invest in an improper tax shelter and that the fraud resulted in their payment of over $700,000 to the Internal Revenue Service ("IRS") in back taxes and interest.[1] Baker answered *Page 931 
the Bennetts' complaint and asserted, among other things, that service of process was defective. Upon Baker's motion, the trial court quashed the purported service on Baker and gave the Bennetts 30 days to file an alias summons and complaint. The Bennetts complied; however, the record is silent as to whether service was ever completed. The Bennetts filed a second alias summons and complaint, which was properly served upon Baker. Baker filed a motion to dismiss, alleging that the trial court lacked personal jurisdiction over him; this motion was denied. Baker then petitioned this Court for a writ of mandamus to vacate the trial court's judgment on that motion, and this Court denied the writ. Baker subsequently filed a second answer to the Bennetts' complaint, and the Bennetts amended their complaint twice in response to the defenses raised.
Baker filed two motions for summary judgment, and both were denied. During the course of the subsequent jury trial, Baker moved for a directed verdict on all claims against him; his motion was granted as to the malpractice claim. The jury returned a general verdict against Baker for $440,025 in compensatory damages and no punitive damages. Baker moved for a judgment notwithstanding the verdict or, in the alternative, a new trial or a remittitur; that motion was denied by operation of law. Baker appeals.
The record reveals that the Bennetts owned a large interest in River Oaks Industries, a mobile home manufacturing business for which J.R. Bennett served as president and chief executive officer. Johnston was the Bennetts' personal accountant, as well as an advisor for many of the Bennetts' business interests. Baker was a business acquaintance of Johnston. J.R. Bennett had met Baker briefly in 1980 during a business meeting unrelated to this case.
In late 1980, the Bennetts were having difficulty paying the large income tax assessments on their successful mobile home manufacturing business. Because the Bennetts sought to continue expanding the business and needed to maximize their cash flow, Johnston suggested that they invest in computer leasing as a tax shelter. Six months earlier, two of Johnston's clients had entered into a computer leasing arrangement recommended to Johnston by Baker. The clients had purchased computers and peripheral equipment from Atlantic Computer Leasing (hereinafter "Atlantic") for $4,128,473. Atlantic, an English corporation, is a large supplier of computer systems and specializes in arranged leases.
Baker had set up several of these transactions for Atlantic and had arranged the following plan involving two of Johnston's clients: IBM sold computers and equipment to two British entities, which entered into a leaseback arrangement with Atlantic. Atlantic then transferred the computers and equipment to Carena, Inc., its Dutch subsidiary, which resulted in tax advantages for the company due to certain provisions of Dutch tax law. Carena sold the equipment through a non-recourse mortgage to Coleman Leasing Corporation, an intermediary entity set up by Baker for this purpose. Baker was the sole stockholder in Coleman Leasing and was, in fact, its attorney. The two clients then purchased the computers and equipment from Coleman Leasing for $586,034. Their interest was subject to the non-recourse mortgage of $3,629,039 held by Carena on its initial purchase of the computers from IBM; however, the clients had no personal obligation to pay this mortgage. The clients paid a total of $100,000 in cash, with the remainder to be paid in escrow to Coleman Leasing according to a 10-year structured payment schedule. From these funds, Baker was required to disburse the monthly payment on the principal due to Carena as well as fees for Carena's broker and his own legal fees. After executing the purchase agreement with Coleman Leasing, the clients immediately leased the computers back to Atlantic for a 10-year period. The amount of the clients' monthly purchase payment to Coleman Leasing was equal to the amount of Atlantic's monthly lease payment to them, so that no money *Page 932 
actually changed hands each month. Under this arrangement, the clients could defer a certain amount of income tax for accelerated depreciation of the computers and for deduction of interest on indebtedness incurred for acquisition of the computers. At the end of the 10-year-lease period, Atlantic would have the option to repurchase the computers and equipment for a nominal amount, then sell them to less-developed countries that have a need for older model computers. This residual value of the computers is Atlantic's primary source of profit in computer leasing transactions.
Baker represented Atlantic in the lease arrangement with the two clients and prepared the contracts and promissory note documents necessary to execute the relationship between Atlantic, Carena, Coleman Leasing, and the clients. The clients were required to make their monthly payments to Atlantic through Coleman Leasing.
Don Gibbs, one of the two clients, subsequently sold his business and no longer needed the full amount of tax deferral generated by the computer leasing arrangement. Johnston then offered a one-half share of Gibbs's interest to the Bennetts, who were initially hesitant to invest in the rather complex transaction. Although he was unfamiliar with all the intricacies of the shelter, Johnston urged the Bennetts to invest and even lent them most of the "up front" money that was necessary for them to do so. Johnston told the Bennetts that they would have to report as income the rents received from Atlantic on the equipment, but that the depreciation of the equipment over the first five years would far exceed this income and would be reported as a loss. The Bennetts could then, he said, defer payment of taxes equal to that loss. Johnston also told the Bennetts that Baker would defend him before the IRS if there were ever any problems with the leasing arrangement. The Bennetts thereafter purchased a one-half share of Gibbs's interest in the computers for $1,315,938, with payments to be made to Gibbs each month.
The Bennetts took state and federal tax deferrals relating to the transactions in their returns for 1981 through 1983. During those years, River Oaks Industries was being audited. In early 1985, prior to the filing of the Bennetts' 1984 tax return, the IRS notified the Bennetts that their personal tax returns would be audited. The Bennetts were represented at the audit by one of Johnston's associates in his accounting firm. At the end of the initial audit in 1985, the IRS informed the Bennetts that it was challenging the validity of the computer leasing, but that it would not go forward on the matter until a decision was rendered in Coleman v. Commissioner, 87 T.C. 178 (1986),affirmed, 833 F.2d 303 (3d Cir. 1987), a case pending before the United States Tax Court at that time. Coleman involved a similar computer leasing tax shelter that had been set up by Baker, using Coleman Leasing as the intermediary. Baker was defending the taxpayer in Coleman.
Johnston discussed the audit with the Bennetts and advised them to do nothing until Coleman was decided. Johnston expressed great confidence in Baker's ability to win the case and assured the Bennetts that there was nothing to worry about. Accordingly, the Bennetts included the deferrals from the computer leasing deal in their 1984 tax returns, which were then added to the audit. The Bennetts retained a different accounting firm to prepare their returns in 1985 and 1986. Upon the advice of Gary Joyce, a member of Johnston's accounting firm, the Bennetts' new accounting firm also included deferrals for the computer leasing in their tax returns for those years.
In a letter dated August 24, 1987, the IRS informed the Bennetts that the computer leasing deal was an "abusive" tax shelter. Specifically, the IRS determined that the computer equipment had been grossly overvalued, giving rise to inflated and fictitious losses. The IRS also questioned whether the computers and equipment ever actually existed, because the documentation relating to the computer leasing transaction did not contain serial numbers for the machinery. Based on these findings, the IRS assessed the Bennetts *Page 933 
back taxes, interest, and penalties totaling $1,200,000 for 1981 through 1984. The Bennetts immediately attempted to contact Baker in New York, but were unable to do so.
After retaining counsel, the Bennetts settled their state tax debt for $42,411.29 and their federal debt for $758,783.56. The IRS dropped its claim for penalties, because it determined that the Bennetts had relied on their advisors in investing in the computer leasing deal.
Baker raises several issues concerning the merits of the Bennetts' fraud claims against him; however, we first address his challenges to several procedural aspects of the case. Baker argues that the Bennetts' fraud claim is barred by the applicable statute of limitations as a matter of law and that the trial court erred in submitting the issue to the jury.
Under Ala. Code 1975, § 6-2-3, fraud actions are considered to have accrued upon the discovery by the aggrieved party of the facts constituting the fraud. Generally, the question of when a party discovered or should have discovered those facts so as to begin the running of the statutory period of limitations is one properly left to the jury. Hicks v. Globe Life AccidentInsurance Co., 584 So.2d 458 (Ala. 1991). The issue may be taken from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would put a reasonable mind on notice of fraud. Hicks, supra.
Based on the Hicks principle, Baker argues that the Bennetts' claim could have accrued at one of three different times: (1) when they received notice of the IRS audit in 1985, (2) when the IRS gave notice in 1986 that it intended to disallow the computer leasing venture as a tax shelter, or (3) when theColeman decision, which involved similar facts and the same type of shelter, was issued in 1986.
The first letter from the IRS that the Bennetts received did not indicate that the computer transaction was suspect, nor was it an assessment for the deductions taken on the transaction. It was merely notice of the pending audit, and the Bennetts turned the matter over to Joyce. There is evidence that the Bennetts knew in 1985 that the tax shelter might come under scrutiny; however, the record does not indicate that the Bennetts had grounds to suspect an underlying fraud at that point. Johnston and Joyce repeatedly assured them that the shelter would be upheld and continued to include the deferrals and deductions under the tax shelter in the Bennetts' 1984 and 1985 tax returns. The Bennetts thereafter retained new accountants to prepare their taxes and included the benefits of the tax shelter in their returns for those years.
The Bennetts had no contact with Baker during this period, but were "guaranteed" by Johnston that the Coleman case would be resolved favorably and thereby would eliminate any doubts the IRS might have about the legitimacy of the tax shelter. The Bennetts did not know the details and intricacies of Coleman, and there is no evidence to indicate that they should have. The Bennetts did not graduate from high school and have no experience in tax or legal matters. In view of this fact, it does not appear unreasonable that the Bennetts would rely on the expertise and assurances of their accountant during the audit.
The record shows that the Bennetts did not know until 1987 that Coleman Leasing was controlled by Baker, that the computers and equipment might not exist at all, and that the value of those goods might have been grossly overvalued. It is those elements that formed the basis of the Bennetts' claims against Baker, not the mere knowledge that their returns were being audited or that the tax shelter could be disallowed. Upon their discovery of facts pertaining to Coleman Leasing and the valuation of the computers themselves, the Bennetts filed a timely complaint. In view of this, we conclude that the Bennetts did not have actual knowledge of the alleged fraud until 1987, within two years of the filing of the complaint. Whether they should have discovered the fraud earlier was an issue properly submitted for the jury's determination. Hicks, supra. *Page 934 
Baker next argues that the Bennetts' action should not be deemed to have been filed in October 1988, because he was not served with process until July 1990. An action is not "commenced for purposes of the statute of limitations if it is not filed with the bona fide intention of having it immediately served." Mace v. Centel Business Systems, 549 So.2d 70 (Ala. 1989). Generally, the claim may be barred where the plaintiff has manifested a lack of intent to serve the defendant promptly after filing. Thompson v. E.A. Industries, Inc., 540 So.2d 1362
(Ala. 1989) citing Ward v. Saben Appliance Co., 391 So.2d 1030
(Ala. 1980) (statute of limitations not complied with where plaintiff requested a delay in service of process after filing complaint). See, also, Pettibone Crane Co. v. Foster,485 So.2d 712 (Ala. 1986) (failure to provide address of defendant was manifest evidence of intent not to promptly serve process).
The record shows that all other defendants in this case were served with process promptly after the filing of the complaint and that service was attempted on Baker. The service of process was sent by mistake to a law office located next to Baker's office in New York, and Baker testified at trial that a secretary in that office received it. Baker immediately acted upon this process by retaining counsel, who filed an answer and appeared at a deposition taken in 1989. He also filed a motion to quash service, which resulted in Baker's being properly served by a specially appointed process server. These facts certainly do not indicate any manifest lack of intent to promptly serve notice upon Baker; thus, we find no merit in this argument.
Baker next argues that the judgment against him is void because the trial court lacked in personam jurisdiction. In personam jurisdiction is proper if the defendant has such contacts with the state that maintenance of the suit does not offend traditional notions of substantial justice. AlabamaWaterproofing Co. v. Hanby, 431 So.2d 141 (Ala. 1983). A party has sufficient contacts with the state of Alabama when that person, acting directly or by agent, is or may be personally responsible as a consequence of that person's transacting business in this state. A.R.Civ.P. 4.2(a)(2)(A). The primary inquiry regarding personal jurisdiction is whether a defendant could have reasonably anticipated that the effects of his acts would be felt by the plaintiff in Alabama. Duke v. Young,496 So.2d 37 (Ala. 1986).
The record shows that as an agent for Atlantic and as president of Coleman Leasing, Baker intentionally sent documents to this state to be executed by residents here, that he obtained promissory notes from Alabama residents that were payable at Alabama banks, that he mailed numerous items related to the computer lease transaction to this state, and that he accepted over $580,000 in cash payments from Alabama residents for Coleman Leasing. It is obvious that the repercussions of these acts would be felt by the Alabama residents involved; thus, we find no error in the trial court's conclusion that it had in personam jurisdiction over Baker.
We now turn to consider Baker's challenges to the merits of this case. He first contends that the trial court erred in denying his motion for a directed verdict on the Bennetts' claims of intentional fraud and suppression, At trial, the Bennetts emphasized that the monthly payments they made to Gibbs for his share in the tax shelter were directed to Coleman Leasing. They claimed that Coleman Leasing was set up for Baker's own profit, with built-in kickbacks to Johnston. They further claimed that Baker and Johnston knowingly created a sham tax shelter and conspired to involve the Bennetts in the scheme in order to pump money into Coleman Leasing. They argued that both Johnston and Baker were guilty of suppressing material facts that would have led to the discovery of the purported fraud, and they accused Baker and Johnston of intentionally misleading them as to the facts underlying the leasing venture.
To prove suppression of a material fact, a plaintiff must establish (1) that the defendant had a duty to disclose that fact, (2) that the defendant concealed or *Page 935 
failed to disclose that fact, (3) that the concealment or failure to disclose induced the plaintiff to act, and (4) that the action caused injury to the plaintiff. Ala. Code 1975, §6-5-102. See, also, Gary v. Kirtland, 514 So.2d 970 (Ala. 1987). Section 6-5-102 does not require proof of an intent to deceive; rather, a breach of the defendant's duty to disclose the suppressed facts is sufficient to trigger liability.Burlington Northern R.R. v. Warren, 574 So.2d 758 (Ala. 1990). Under § 6-5-102, a duty to disclose arises either from a confidential relationship between the parties or from the particular facts and circumstances of the case. The question of the existence of a duty to communicate under § 6-5-102 is for the jury, which should consider the relationship of the parties, the value of the particular facts suppressed, and the relative knowledge of each party. Lowder Realty, Inc. v. Odom,495 So.2d 23 (Ala. 1986). Where the defendant had superior knowledge of the suppressed fact and the defrauded party has been induced to take action that otherwise might not have been taken, the obligation to disclose is particularly compelling.Dominick v. Dixie Nat'l Life Ins. Co., 809 F.2d 1559 (11th Cir. 1987).
In this case, there is no substantial evidence of a confidential relationship between Baker and the Bennetts that would give rise to a duty to disclose the facts underlying the computer leasing venture. However, the record shows that the Bennetts talked to Baker briefly by telephone in 1981, when they were in Johnston's office deliberating over whether to buy into the computer leasing venture. In that conversation, Baker stated that computer leasing was a "good tax shelter," but he did not reveal any of the underlying facts of the operation. It is undisputed that Baker had superior knowledge of the actual value of the computers and of the role of Coleman Leasing in the arrangement and also knew that these factors could be critical if the IRS questioned the tax shelter. It is likewise undisputed that the Bennetts relied on Baker and Johnston's expertise in entering into the venture.
In view of these facts, we cannot say that the trial court erred in submitting the issue of suppression to the jury. A directed verdict is proper only where there is a complete absence of proof on a material issue or where there are no disputed questions of fact on which reasonable people could differ. National Security Fire Casualty Co. v. Vintson,454 So.2d 942 (Ala. 1984). Here, there was evidence relating to the elements of fraud under § 6-5-102, and much of it was highly controverted; thus, Baker's motion for a directed verdict was properly denied.
Likewise, we hold that the trial court did not err in failing to direct a verdict against the Bennetts' claim of fraudulent misrepresentation under § 6-5-101. Before a claim under this section may be submitted to the jury, the plaintiff must establish four elements of fraud: (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result. CherokeeFarms, Inc. v. Fireman's Fund Ins. Co., 526 So.2d 871 (Ala. 1988). A false representation, even if made by mistake or innocently, is a legal fraud and this section applies, entitling a plaintiff to compensatory damages. Morgan v. SouthCentral Bell Tel. Co., 466 So.2d 107 (Ala. 1985). Where the evidence reasonably affords an inference that the plaintiff was defrauded by the misrepresentation, the case is one for the trier of fact. Hartselle Real Estate Ins. Co. v. Atkins,426 So.2d 451 (Ala.Civ.App. 1983).
Baker argues that the representation he made to the Bennetts, i.e., that computer leasing was a good tax shelter, was not false at the time he gave it in 1981. At that point, theColeman case had not been decided and the shelter had not been disallowed. Baker also correctly points out that the mere statement of an opinion is usually not a representation of material fact upon which an action for legal fraud can be based, particularly when there is no evidence of an intent to deceive. Reynolds v. Mitchell, 529 So.2d 227 (Ala. 1988). However, the Bennetts did not base their claim of misrepresentation solely on Baker's *Page 936 
opinion of the tax shelter. The Bennetts also alleged that Baker first misrepresented the amount of money that would be directed through Coleman Leasing and then misrepresented the actual and residual value of the computers involved in the transaction. The record shows that the Bennetts' scheduled payments to Gibbs were channeled through Coleman Leasing for disbursal to Carena and the underlying parties in the transaction. Baker sharply disputed the impropriety of any of these disbursals, but was unable to produce a complete record of the money he allocated as the attorney in fact and sole shareholder of Coleman Leasing. Moreover, an expert witness for the Bennetts testified that the value of the computers was considerably less than Baker reported it to be. While this testimony was rebutted with detailed evidence from Baker concerning the true value of the equipment, it was sufficient to create an inference of fraudulent misrepresentation.
Baker next argues that the trial court erred in failing to give certain jury instructions regarding the issues of suppression and material misrepresentation. The record shows that during the trial, the Bennetts' counsel sought to establish that Baker "pocketed" the funds paid into Coleman Leasing and that the underlying transaction was a sham. During closing argument, the Bennetts' counsel asked the jury to "Stop lawyers in the biggest law firm in America" and "New York lawyers" from putting together abusive tax shelters. Baker's counsel objected to these comments when they were made, and the trial court sustained the objections and gave curative instructions.
In a fraud case, counsel is given broad leeway in arguing the merits and is allowed in closing argument to comment on all proper inferences from the evidence based on his own reasoning.Seaboard Coastline R.R. v. Moore, 479 So.2d 1131 (Ala. 1985). When an objection to an improper comment during argument is sustained and the trial court instructs the jury to disregard the remark, the test on appeal is whether the comment was so prejudicial that its effect was not or could not be eradicated from the minds of the jurors. Harrison v. Woodley SquareApartments, 421 So.2d 101 (Ala. 1982).
In this case, Baker insists that the statements made by the Bennetts' counsel inflamed the jury and resulted in an unreasonably high verdict. However, the statements in question were made primarily in counsel's attempt to win an award of punitive damages for the Bennetts. The fact that the jury declined to award even a small amount of punitive damages indicates that the statements made by the Bennetts' counsel did not unduly prejudice their minds against Baker. We therefore find the statements not so inflammatory as to warrant a new trial.
Baker next argues that the jury's award of $440,025 in compensatory damages was unsupported by the evidence and is, thus, due to be overturned. He contends that this amount was computed based on the amount of taxes the Bennetts were required to pay to the IRS. Baker points out that the tax benefit to be gained from the computer transaction was a deferral, not a deduction, and that the Bennetts would have had to pay taxes to the IRS in any event. However, the amount of taxes paid to the IRS by the Bennetts is not the only element the jury could have considered in making its award. As previously discussed, there was evidence that the Bennetts paid an inflated amount for computer equipment that was grossly over-valued and then lost the residual value of the equipment. At trial, counsel for the Bennetts vigorously argued that this evidence should be a primary element in the jury's award of damages.
In reviewing a jury verdict, this Court must determine whether the evidence, viewed in the light most favorable to the plaintiff, was so preponderantly against the verdict as to be plainly and palpably wrong and unjust. Christiansen v. Hall,567 So.2d 1338 (Ala. 1990). After examining the evidence contained in the record, we cannot say that it is so entirely against the verdict as to constitute plain error; therefore, in accordance with our *Page 937 
narrow standard of review, we must affirm the jury's determination of this issue.
The judgment entered by the trial court pursuant to the jury verdict is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, HOUSTON, KENNEDY and INGRAM, JJ., concur.
[1] The Bennetts' claims against Johnston and Johnston's accounting firm were settled; neither of those defendants is a party to this appeal.