**HENIG FURS, INC., Plaintiff,**

**v.**

**J.C. PENNEY COMPANY, INC., Defendant.**

Civ. A. No. 91–D–15–N.

United States District Court, M.D. Alabama, N.D.

Jan. 29, 1993.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, AL, for plaintiff.

Charles L. Anderson, Parnell, Crum & Anderson, Montgomery, AL, Mary G. Tacher, John B. Rizo, Sr. and James P. Waler, Jr., Legal Dept. of J.C. Penney, Dallas, TX, for defendant.

## MEMORANDUM OPINION

DE MENT, District Judge.

Now before the court is defendant J.C. Penney Company's ("Penney") motion for summary judgment filed November 15, 1991. Plaintiff Henig Furs ("Henig") responded December 26, 1991. Defendant Penney filed a reply brief on January 7, 1992.

## JURISDICTION

This court has subject-matter jurisdiction under the diversity jurisdiction statute, 28 U.S.C. § 1332, as there exists complete diversity between the parties and the amount in controversy exceeds $50,000.

## FACTS

Plaintiff Henig is a fur dealer located in Montgomery, Alabama. Defendant Penney is a retailer which operates a nationwide chain of department stores. Its corporate headquarters are in Dallas. In January of 1990, Henig's sales manager, Mark Drumwright, contacted Penney's corporate buyer for outerwear, Connie Beasley, in order to find out whether Penney was interested in buying plaintiff's furs to sell in its stores during the 1990 season. According to plaintiff, Ms. Beasley told Mr. Drumwright that the plaintiff should contact individual stores if it wanted to sell furs to Penney.

Mr. Drumwright evidently contacted Penney's stores in Oklahoma City and Tulsa, Oklahoma through Ms. Sharlene Preisch, Penney's business planning manager for the district encompassing Oklahoma and parts of West Texas. On April 18, a meeting ("the April meeting") was held at which Mr. Drumwright showed fur samples to Penney's representatives from the district, some of whom showed an interest in some of the merchandise. Several representatives completed forms on which they wrote down descriptions of the merchandise in which they were interested along with the wholesale price.

After the meeting, Mr. Drumwright evidently had possession of the forms. However, after Ms. Preisch allegedly told him that she needed the forms in order to obtain retail prices and that she would send him the forms as soon as she received them from Dallas, he turned them over to her.

At some point in late April or early May, Ms. Preisch called Penney headquarters. The new corporate buyer for outerwear, Ken Mangone, allegedly told her that there was no active corporate fur program, although he did not tell her that she was prevented from purchasing furs.

In May, Ms. Preisch told Mr. Drumwright that he would have to contact Mr. Mangone if Henig wanted to sell furs to

Penney that year. Mike Henig, president of Henig Furs, contacted Mr. Mangone and told him that Henig had "commitments" from several stores in Oklahoma. Mr. Mangone assured Mr. Henig that Penney would honor any Penney purchase orders and invited Mr. Henig to submit any outstanding fur orders. Mr. Henig did not do this, sending instead a list of stores that "have expressed a desire to be involved in the 1990/91 program."

No Penney's stores from the Oklahoma City area purchased furs from Henig during the 1990 season. Henig did not ship furs to any stores in that area, although it did ship furs to other Penney's stores.

## SUMMARY JUDGMENT STANDARD

 On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d

265 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

## DISCUSSION

Defendant seeks summary judgment on all six counts of the plaintiff's complaint. The court will discuss the counts by category.

### A. *Fraud Claims* [1]

#### 1. Connie Beasley

 Under Alabama law, in order to maintain a claim for fraud, plaintiff must show that defendant made a false statement of an existing material fact which the defendant either knew was false or which defendant made without regard to its truth or falsity and upon which plaintiff justifiably relied to its detriment. *See, e.g., First Alabama Bank v. First State Ins. Co.*, 899 F.2d 1045, 1056 (11th Cir.1990) (discussing Alabama law).[2] Because the false statement must concern an existing material fact, if the defendant makes a promise to perform in the future, plaintiff must demonstrate that at the time defendant made the promise, it did not intend to keep it. *Green Tree Acceptance, Inc. v. Doan*, 529 So.2d 201, 206 (Ala.1988).

The facts surrounding the first instance of alleged fraud are as follows. According to Mr. Drumwright, in January of 1990, Ms. Beasley telephoned him and requested a list of the Penney stores with which Henig had done business in 1989. He sent her a list of the stores and offered to send

---

1. Plaintiff has stated claims for intentional fraud, reckless fraud, innocent fraud, promissory fraud and suppression. The court will discuss the fraud claims and the suppression claims separately.

2. Alabama also allows a plaintiff to sue for an innocent misrepresentation—any false statement made by defendant upon which plaintiff justifiably relied to its detriment. *See* Ala.Code § 6–5–101 (1975).

her samples of furs for use in a "broadcast."[3] Deposition of Mark Drumwright at 22. ("Drumwright"). After Ms. Beasley received the list, she allegedly called Mr. Drumwright again and told him that she did not want the samples because they were not going to put furs in the "broadcast" but that Henig was free to call on individual stores as it had done before. She also allegedly told him that Penney's corporate management would not interfere with the decisions of the individual stores. Drumwright at 22–23. Ms. Beasley denies making this statement. Deposition of Connie Beasley at 37–41 ("Beasley").[4]

Penney argues that its agent cannot be guilty of any type of fraud because all of the statements made to Henig were true at the time they were made. First, Penney claims that it had not yet made the decision to discontinue selling furs as of January 1990. It is not clear from the evidence exactly when Penney made the corporate-level decision to leave the fur business. Apparently, the power to make such decisions is vested in Penney's division vice-presidents, a group of high-level Penney executives. Deposition of Marshall Beere at 8 ("Beere"). Each area of Penney—women's, men's, children's, and home—has its own group of decisionmakers, known as "the team." *Id.* at 9. In 1990, Marshall Beere was a division vice-president and a member of the women's team. *Id.* at 10. At his deposition, he stated that one member of the women's team had made the decision to stop selling furs. *Id.* at 15. Plaintiff's counsel asked Mr. Beere about that decision. The following exchange occurred:

Q: What time are you referring to?

A: I'm referring to, you know, mid–'90, somewhere around there.

Q: Are you suggesting that the decision was not made until mid–'90?

A: I'm suggesting I can't remember when it was. It could have been—it could have been mid–'90, yeah.

Q: Could it have been earlier than mid–'90?

A: Yeah, perhaps.

Q: Could it have been as early as mid–1989?

A: Yeah.

There is apparently no documentation of the events that occurred at this meeting and there is apparently no one who remembers more about this meeting than Mr. Beere. *Id.* at 16–19.

All of the Penney employees deposed have testified that they did not learn of the decision until spring 1990. Ms. Beasley testified that she did not learn of the decision until some time in June or July 1990, when Mr. Mangone told her, although she admits that she had heard rumors that Penney had such plans and had discussed such an eventuality with her superior in 1989. Beasley at 19–21. Ken Mangone, who succeeded Ms. Beasley in April 1990, testified that he learned of this decision at some point between April and June 1990, although he admitted that the decision could have been made earlier. Deposition of Ken Mangone at 11–12. Gary Hagen, the general merchandise manager of Penney's Amarillo, Texas store and Sharlene Preisch, the district buying manager for Oklahoma and West Texas, both claim that they learned of the decision in April or May when Ms. Preisch called corporate headquarters and spoke with Mr. Mangone. Deposition of Gary Hagen at 52. ("Hagen"); Deposition of Sharlene Preisch at 97–100 ("Preisch"). Ron Pyles, Penney's merchandise manager, indicated that he knew as of March 1, 1990 that Penney did not have a fur program. Deposition of Ron Pyles at 34. ("Pyles").

---

**3.** A "broadcast" is a live television presentation sent by Penney headquarters to all of its stores across the country. *See* Deposition of Marshall Beere at 24 ("Beere"). Each store has a satellite dish on its roof so that its management can watch the broadcasts, just as one would watch a regular television show, in order to learn what merchandise will be available for it to purchase. *Id.*

**4.** Because this is a motion for summary judgment, the court must view the facts in the light most favorable to the plaintiff. Accordingly, the court assumes for purposes of this motion that Ms. Beasley spoke as plaintiff claims she did.

The moving party is entitled to summary judgment when the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. The court finds that plaintiff Henig has failed to offer more than merely colorable proof that Penney made the decision to leave the fur business before January 1990. Henig would bear the burden of showing at trial that Ms. Beasley misrepresented an existing material fact and the court finds that plaintiff has failed to make a sufficient showing that the fact was existing at the time Ms. Beasley made her alleged statement. Accordingly, defendants are entitled to judgment as a matter of law as to this part of Ms. Beasley's alleged misrepresentation.

Defendant further claims that the other part of Ms. Beasley's statement—that Penney headquarters would not interfere with the buying decisions of its local stores—was also true at the time Ms. Beasley said it.[5] The statement allegedly made by Ms. Beasley is a statement regarding activity on Penney's part in the future. Thus, in order for Ms. Beasley to commit promissory fraud, she must have known in January of 1990 that the orders from individual stores could not be processed without approval from Penney headquarters.

Penney's procedure for ordering merchandise is somewhat confusing. Mr. Hagen testified that his store in Amarillo carried Henig furs in 1989 and that Mr. Drumwright supplied *him* with the lot numbers.[6] Hagen at 15. He also saw nothing abnormal in working directly with Mr. Drumwright. Mr. Mangone testified that all merchandise sold at Penney's stores was procured through Penney's headquarters and that it was unusual for a vendor to work directly with a local store. Mangone at 8–10. Mr. Pyles stated that while normally the local stores ordered their merchandise solely through the national broadcasts, it was possible for a local store to sell items not presented by Penney headquarters if it contacted headquarters and obtained approval. Pyles at 14–16. He added that this procedure was not always followed. *Id.* Ms. Preisch stated that she believed it was necessary to have a lot number from the corporate buyer in Dallas before she could place an order with a vendor. Preisch at 34–35. On the other hand, she also stated that it was possible for a store to purchase furs without a lot number from headquarters, as the Amarillo store did in 1989. *Id.* at 40.

It appears from the evidence before the court that there was no consensus among Penney's personnel as to the procedure used to order merchandise. The use of lot numbers and the need for corporate approval seems to vary from store to store. For example, the facts indicate that some stores did order furs from Henig during the spring of 1990 and apparently encountered no interference from Penney management—facts fully consistent with Ms. Beasley's alleged statement. *See* Drumwright at 19; Henig at 68. Nonetheless, the court finds that the plaintiff has presented substantial evidence which would tend to show that at least some of the stores either would not or could not order merchandise without the approval of corporate headquarters. Because genuine questions remain with respect to Penney's corporate policies regarding the authority of the individual stores to select and purchase merchandise, defendant is not entitled to judgment as a matter of law as to this specific alleged misrepresentation.

## 2. Sharlene Preisch

The next instances of alleged fraud occurred when Sharlene Preisch made rep-

---

**5.** Again, Ms. Beasley denies making the statement. Beasley at 37–41.

**6.** A lot number describes the manufacturer and the model of the item sold. Thus, if a shirt company made one model of button-down shirt, that type of shirt from that manufacturer would be assigned a lot number. The different colors and sizes would be indicated by a line number.

resentations to Mr. Drumwright that the meeting to be held in Tulsa on April 18, 1990 was for the purpose of taking fur orders.[7] Ms. Preisch freely admits that she did not intend for store personnel to place orders at this meeting and claims that she never told Mr. Drumwright that the meeting was for the purpose of taking orders. *See* Preisch at 28, 39.

Mr. Henig, however, testified that "[Ms. Preisch] told us that, yes, we would get—set up the show for these stores to come in and to be ready to purchase furs for the coming season." Deposition of Mike Henig at 29 ("Henig"). He also stated: "This was not a meeting to see if they were going to participate in the fur program. They had basically already told us that these stores were coming, to be prepared." *Id.*[8] Evidently, Mr. Henig learned this information from Mr. Drumwright, although he did not state the source of his information and although Mr. Drumwright himself did not discuss Ms. Preisch's pre-meeting statements during his deposition.

The evidence presented by plaintiff in opposition to summary judgment is not particularly strong, as the person to whom the alleged statements were made does not claim the speaker made them. Also, Mr. Henig's version of Ms. Preisch's alleged statements is somewhat ambiguous. However, because this matter involves the word of one party against the word of the opposing party as to a material misrepresentation, and because the court must construe the facts in the light most favorable to the nonmoving party, the court is constrained by the summary judgment standard and is unable to grant judgment as a matter of law.[9]

▪ Next, Mr. Drumwright claims that Ms. Preisch took the completed forms from him at the conclusion of the April meeting, telling him that she had to put the retail prices on them—an addition to the forms which Mr. Drumwright believed would in no way affect the validity of the alleged contracts—and that she would send the forms to him when she got them back from the Dallas office.[10] Drumwright at 49, 72. Plaintiff characterizes this as a fraudulent misrepresentation, arguing that Mr. Drumwright was led to believe that the forms were binding contracts because of Ms. Preisch's alleged remark.

Ms. Preisch denies these allegations. She stated during her deposition that: "I told Mark [Drumwright] on April 18, 1990 that no orders would be placed until I could get answers to questions that I had about the fur promotion." Preisch at 64.

Ms. Preisch's alleged statement is a mixture of promissory fraud and fraudulent misrepresentation. When she allegedly told Mr. Drumwright that she needed the forms to put retails on them, she made a statement about an existing material fact. However, when she allegedly told Mr. Drumwright that she would send the forms to him after she got them back from the Dallas office, she made a statement regarding her conduct in the future.

There is no evidence that it was unnecessary to place the retails on the order form, so that this portion of Ms. Preisch's alleged

---

7. The buyers of the individual stores allegedly joined Ms. Preisch in this alleged misrepresentation.

8. Ms. Preisch *did* send a letter to the store managers in her area dated April 5, 1990 in which she wrote that "[m]erchandisers need to come [to the meeting with Mr. Drumwright] prepared to place buys." *See* Preisch, Exh. 2. However, plaintiff has produced no evidence that any representative from Henig knew of that letter in order to be able to justifiably rely on it. Thus, while the letter may be evidence of Ms. Preisch's state of mind shortly before the April meeting, it is not in itself an instance of fraud.

9. The court notes that if the evidence at trial shows that valid, binding orders *were* taken at

the April meeting, there was no fraud on Ms. Preisch's part. The jury will be instructed accordingly to avoid the possibility of an inconsistent verdict.

10. Plaintiff also claims that the buyers from the individual Penney stores indicated that the forms were binding on Penney. However, plaintiff has not produced *any* evidence (names of speakers, alleged statements made) supporting this claim; i.e., the allegation is made solely as a bare conclusion. Accordingly, defendant is entitled to summary judgment regarding allegedly fraudulent statements made by individual store buyers after the April meeting.

remark was apparently true. The only evidence that Ms. Preisch had no intention of sending the forms to Mr. Drumwright is found in the deposition testimony of Mr. Hagen. Mr. Hagen stated that Ms. Preisch called Dallas headquarters on April 18th to discuss lot numbers. According to Mr. Hagen, after the telephone call, Ms. Preisch informed him that Dallas was not recommending a fur program and that there were no lot numbers available at that time. Hagen at 63–67. Ms. Preisch also allegedly told Mr. Hagen that she would get back to him about the fur program because she thought it might go forward on a district level. Hagen at 66. It is not clear whether this conversation took place before or after Ms. Preisch collected the order forms and spoke with Mr. Drumwright. Hagen at 52.

If one assumes that Ms. Preisch made the remarks Mr. Drumwright attributes to her and if one assumes that the phone call Mr. Hagen overheard took place before Ms. Preisch collected the forms, one might reasonably conclude that Ms. Preisch had no present intent to send the forms to Henig, as she allegedly told Mr. Drumwright she would. Had Mr. Drumwright been made aware of the problems with Penney headquarters he probably would not have left Oklahoma under the impression that valid orders had been taken. Accordingly, the court is unable to grant judgment as a matter of law in favor of defendant.

B. *Suppression*

1. The First Suppression Claims

The first set of suppression claims closely parallels plaintiff's fraud claims. The second set relates to Penney's alleged withholding of monies due Henig.

■ In Alabama, a plaintiff alleging suppression must show that defendant failed to reveal a material fact which it was obligated to communicate to the plaintiff. *Trio Broadcasters, Inc. v. Ward,* 495 So.2d 621, 623 (Ala.1986). *See also* Ala.Code § 6–5–102, § 6–5–105 (1975). As with the other types of fraud, defendant's suppression must induce the plaintiff to act and the plaintiff must be damaged as a result.

*First Alabama Bank v. First State Ins. Co.,* 899 F.2d 1045, 1056 (11th Cir.1990) (discussing Alabama law).

■ A fundamental element of suppression is the existence of a duty to disclose. Such a duty can arise when there is a confidential or fiduciary relationship between the parties, when one party has superior bargaining power, or when one party assumes a duty by speaking. *See id. See also Jim Walter Homes, Inc. v. Waldrop,* 448 So.2d 301, 305 (Ala.1983). A duty to speak depends on the fiduciary relationship of the parties, the value of the particular fact, the relative knowledge of the parties and other circumstances of the case. *Hall Motor Co. v. Furman,* 285 Ala. 499, 234 So.2d 37 (1970). The existence of a duty is to be determined on a case-by-case basis and presents a question of fact for the jury. *Baker v. Bennett,* 603 So.2d 928, 935 (Ala.1992).

■ In general, Alabama courts have been reluctant to read such a duty into arm's-length dealings between merchants. *See Trio Broadcasters,* 495 So.2d at 495 (citations omitted). The mere fact that one party to a contract knows more about its internal workings than the other party will not give rise to such a duty. *See, e.g., Norman v. Amoco Oil Co.,* 558 So.2d 903, 905 (Ala.1990) (defendant not under a duty to disclose detailed information about its price index). However, when the defrauded party is induced to take action that it might not otherwise have taken by virtue of the suppression, the existence of a duty is more compelling. *Baker,* 603 So.2d at 935 (citations omitted).

Here, there is no evidence of a confidential or fiduciary relationship between the parties nor is there any indication that defendant had bargaining power superior to that of Henig in this transaction. Both parties are merchants and are knowledgeable about transactions such as the ones at issue here. Therefore, the only possible way a duty could arise is if Penney assumed it by speaking in a misleading manner. When the defendant makes a partial revelation of facts within its knowledge, it

may assume a duty to make a full and fair disclosure. *Ellis v. Zuck,* 409 F.Supp. 1151, 1157 (N.D.Ala.1976).[11]

■ The court finds that plaintiff has demonstrated that there is a jury issue with regard to two of the statements made by agents of defendant.[12] Assuming, as the court must for purposes of this motion, that Ms. Beasley stated that the individual stores had the authority to order merchandise, a reasonable jury could conclude that she assumed a duty to qualify the statement by explaining to Mr. Drumwright the fact that approval from corporate headquarters was still necessary. Had Mr. Drumwright been so informed, one could reasonably conclude that he would not have left the Oklahoma meeting under the impression that valid contracts had been formed.

Again, assuming that Ms. Preisch stated that it was necessary to send the forms to Dallas so that retails could be assigned to them, a reasonable jury could conclude that she assumed a duty to disclose that she had serious questions about the viability of the fur program that needed to be resolved before any valid orders could be placed (if she had contacted Dallas and had such doubts).[13] By telling Mr. Drumwright that the forms had to be sent to Dallas, she was then required to make a fair disclosure of the fact that it was unlikely that Dallas would approve the sales. Again, had Mr. Drumwright been so informed, it is unlikely that he would have left the April meeting under the impression that valid contracts had been formed. Accordingly, the court finds that defendant is not entitled to summary judgment as to these two instances of alleged suppression.[14]

### 2. The Second Suppression Claim

Plaintiff's second suppression claim relates to the alleged wrongful withholding of monies due Henig. According to Henig, Penney suppressed the fact that it intended to place a partial hold on Henig's account. Defendant claims that it informed Henig of this fact.

In its complaint, Henig states "In June of 1990, plaintiff's representatives met with representatives of defendant in Dallas. Said defendants represented that all commitments and orders would be honored, but that defendant would withhold 50% of payments to plaintiff." Complaint at 6. On October 18, 1990, Mr. Mangone wrote Mr. Drumwright a letter in which he informed Henig that Penney "would be placing 50% of payments on 'hold' between now and February." Affidavit of Ken Mangone, Exh. F. Mr. Mangone further wrote that the hold was "necessary to prevent a potential debit from occurring due to [Henig's] policy stating 'each store will be al-

---

11. For example, in *First Alabama Bank,* the defendant insurer told plaintiff that defendant's London reinsurers had the final authority to extend prior acts coverage and that there was no other market for such coverage, when in fact London had approved the coverage and the insurer itself refused to extend coverage. *First Alabama Bank,* 899 F.2d at 1051. The court found that the parties were not dealing at arm's-length because the insurer, as one of the leading providers of this type of insurance, had better knowledge about the availability of this coverage than First Alabama Bank did. *Id.* at 1059.

12. The court has already determined that plaintiff has not shown that Penney made the decision to leave the fur business any earlier than March 1, 1990. Therefore, Ms. Beasley's failure to disclose that fact cannot form the basis for a suppression claim.

13. Defendant also argues that plaintiff has failed to show reliance and damages, as it has

admitted that it ordered most of its merchandise in March, well before any of the alleged misrepresentations or suppressions were committed. *See* Henig at 57. Defendant is entitled to judgment as a matter of law as to the merchandise plaintiff ordered in March. There is no indication that Penney represented to Henig that it would order furs before March so that plaintiff can not possibly have relied on a misrepresentation made by plaintiff. However, it appears that plaintiff produced some merchandise in April, after the Oklahoma meeting, and defendant is not entitled to judgment as to damages arising out of the production of that merchandise.

14. In its complaint and amended complaint, plaintiff alleges numerous instances of alleged suppression which are related in one way or another to the two incidents discussed above. Plaintiff is entitled to take to the jury alleged suppressions which arise out of the assumed duty to disclose as discussed above.

lowed to return 50% of their initial purchase at the end of the fur season.'" *Id.* At the present time, Penney is not holding back any money from Henig.

According to the plaintiff, because Henig made known its displeasure with Penney's proposed plan to withhold monies during the June meeting, Penney therefore assumed a duty to update Henig on its intention to follow through with its stated plan. Complaint at 6–7. Henig claims that it incurred damages in the period between June and October.[15]

Neither Mr. Mangone nor Mr. Pyles remembered any discussion about holding back money. Mangone at 44; Pyles at 53. Defendant's notes of the meeting do not mention this discussion. Plaintiff's Exh. 15. Mr. Henig stated that Mr. Pyles told him at the June meeting that "since these orders were going to be a fifty percent return, he wanted to hold back payment." Henig at 39. Mr. Henig responded that Penney had never done that before, that Penney had always paid in full. According to Mr. Henig, Mr. Pyles acknowledged the truth of what Mr. Henig stated. *Id.* Mr. Drumwright claims that "Mr. Henig told [Mr. Pyles] that [the holding back of payments] was unacceptable and [Mr. Pyles] accepted that." Drumwright at 105.

As noted above, courts are reluctant to impose a duty to disclose when both parties to the transaction are knowledgeable and capable of handling their own affairs and when one side does not have superior bargaining power. *See Trio Broadcasters,* 495 So.2d at 624. The existence of a duty could arise only if Penney assumed it by making a partial revelation of facts within its knowledge. *Ellis,* 409 F.Supp. at 1157. The court finds that plaintiff has not met its burden of coming forward with substantial evidence from which a reasonable jury could conclude that Penney assumed a duty to disclose. While there are two different versions of the June meeting, both versions are told by agents of the plaintiff.

Even if defendant's version of the June meeting were correct, Henig has still failed to come forward with substantial evidence that Penney suppressed a material fact. Implicit in the concept of suppression is the idea that the deceived party be unaware of the fact suppressed. *See, e.g., Norman,* 558 So.2d at 905 (where plaintiff was aware of fact allegedly suppressed, summary judgment was proper). *See also Deupree v. Butner,* 522 So.2d 242, 245 (Ala.1988) (defendant stood in a special relationship to plaintiffs who had no knowledge of the fact but relied on him). Henig has offered no evidence of superior knowledge of a material fact on Penney's part. The evidence shows that Henig knew that Penney owed it money and Henig knew that it had not been paid the money it was owed. Penney cannot have suppressed facts actually known to the plaintiff. There is no evidence suggesting that Henig did not realize that it had not been paid for its shipments of furs or that Penney took steps to conceal from Henig the fact that it was withholding monies. What Henig appears to require from Penney is essentially advance notice of its impending breach of an agreement.[16] Accordingly, the court finds that defendant is entitled to judgment as a matter of law as to plaintiff's Count V.

### 3. The Wantonness and Negligence Claims

Plaintiff has also brought claims for "negligence" and "wantonness." At the pretrial hearing, plaintiff's counsel informed the court that these claims were essentially claims for innocent and reckless suppression. In an action for suppression it is not necessary to show intent to deceive; it is sufficient to show a breach of the defendant's duty to disclose. *Baker,*

---

15. Plaintiff is somewhat vague about the nature and extent of the damages sustained during the four-month period from June to September.

16. This assumes that there was some type of understanding between the parties that Penney would pay for goods as they were shipped. Ac-

tually, if one follows Henig's reasoning, every breach of contract would give rise to a claim for suppression if the breaching party did not inform the other party of its intention to breach in advance of the act.

603 So.2d at 935. The defendant's state of mind at the time of the breach is not an element of the action. Thus, one cannot maintain separate claims for innocent, reckless, and intentional suppression.[17] Accordingly, defendant is entitled to judgment as a matter of law as to plaintiff's Count IV.

■ Defendant also moves for summary judgment as to plaintiff's claims for punitive damages, claiming that it has shown no evidence that defendant's actions were oppressive, fraudulent, wanton or malicious as these terms are defined by the relevant statute. See Ala.Code § 6–11–20. However, the definition of "fraudulent" encompasses the idea of intentional fraud. Because plaintiff has presented some evidence that agents of the defendant might have made statements or suppressed statements with the intent to deceive, the court is unable to grant summary judgment as to punitive damages.

## C. Breach of Contract

### 1. The First Contract

According to plaintiff Henig, there are two separate contracts are implicated in this complaint. The first contract [18] between Henig and Penney was entered into at the April meeting in Oklahoma. Henig claims that the purchase order forms filled out by the individual store representatives at that meeting were binding contracts. Defendant argues that the alleged contracts do not satisfy the Statute of Frauds and that no contracts were formed at the April meeting.

Because the transaction at issue involves an alleged contract for the sale of goods, it is governed by the Uniform Commercial Code. See Ala.Code § 7–2–105, 7–2–106 (1975). The UCC provides that "a contract for the sale of goods may be made in any manner sufficient to show agreement...." Ala.Code § 7–2–204(1) (1975). However, a contract for the sale of goods with a price greater than $500.00 will not be enforced in the absence of a writing confirming the existence of a contract. The applicable Statute of Frauds reads:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker ...

Ala.Code § 7–2–201(1).

The official comment to the UCC contains the following provision: "It is not necessary that the writing be delivered to anybody. It need not be authenticated by both parties but it is, of course, not sufficient against one who has not signed it." U.C.C. § 2–201 advisory committee's note.

■ To the extent that the purchase orders are signed by representatives of Penney, they are sufficient to constitute a writing for purposes of the Statute of Fraud.[19] However, a question remains as to whether or not the individual store representatives were "authorized agents" of Penney. The existence of an agency relationship is a question of fact for the jury.[20]

---

**17.** The court's research reveals no authority for either of these causes of action nor did plaintiff provide the court with any such authority. In Alabama, one may sue in tort for breach of an express promise to use due care in the performance of a contract; however, the court can find no evidence of such an express promise made by Penney to Henig. See, e.g., Blumberg v. Touche–Ross & Co., 514 So.2d 922, 926–26 (Ala.1987) (accountant's breach of promise to use due care in providing accounting services); Eidson v. John–Ridout's Chapels, Inc., 508 So.2d 697, 700 (Ala.1987) (funeral home's breach of promise to use due care in providing mortuary services).

**18.** Actually, this claim refers to a group of alleged contracts between Mark Drumwright, as representative of Henig, and various representatives of Penney stores in the Oklahoma City area.

**19.** Defendant is entitled to summary judgment as to the unsigned purchase orders.

**20.** If the individual store representatives were authorized agents, then they had the authority to bind Penney orally and the writing is sufficient to confirm the oral agreement. However, if the individual store representatives did not have the authority, then they could not bind Penney and the writing is insufficient to satisfy the Statute of Frauds.

Even though the signed forms are sufficient to serve as a writing under the Statute of Frauds, plaintiff must still prove the existence of the underlying oral contract. The law requires that there be a "meeting of the minds" between the parties before a contract can be formed. While it is clear that Henig made Penney an offer, it is less clear that Penney accepted the offer. However, in general, whether an offer was accepted is a question of fact for the jury. Accordingly, defendant is not entitled to judgment as a matter of law as to plaintiff's first breach of contract claim contained in Count II of the complaint.

### 2. The Second Contract

 The second contract was allegedly formed when Connie Beasley told Henig in January 1990 that it could solicit orders from individual Penney stores without any interference from Penney corporate management. According to plaintiff Henig, this statement was an offer to enter into a unilateral contract which Henig then accepted by contacting the individual stores. Breach allegedly occurred when Penney management told the stores in the Oklahoma area that they could not order furs that year.

It is true as a matter of hornbook law that a unilateral contract consists of a promise by one party and an acceptance by performance on the part of the other party. *See, e.g.,* 17A Am.Jur.2d *Contracts* § 100 (1991). However, the court finds as a matter of law that the element of consideration is lacking from this transaction. Penney did not receive anything of value from this arrangement and Henig did not experience any detriment from its participation in the "bargain." While Penney's statement to Henig might possibly be deemed fraudulent inducement to enter the alleged contracts discussed in the preceding section, it does not in itself constitute a contract or an offer to enter a contract. Accordingly, the court finds that defendant Penney is entitled to judgment as a matter of law as to Count VI of the complaint.

### CONCLUSION

Based on the foregoing, the court finds that defendant is entitled to judgment as a matter of law on the following issues and claims: (1) the alleged fraudulent misrepresentation and suppression concerning the existence of a fur program in 1990 contained in Count I and Count III; (2) the alleged negligent and wanton suppression claims contained in Count IV; (3) the suppression claim contained in Count V; and (5) the claims relating to the existence of a contract based upon Ms. Beasley's statements contained in Count VI.

The issues remaining for trial are: (1) plaintiff's claims for fraud based on statements made by Ms. Beasley in regard to the authority of the individual stores to order furs contained in Count I; (2) plaintiff's claims for fraud based on statements made by Ms. Preisch before and during the April meeting contained in Count I; (3) plaintiff's claims for suppression which relate to the alleged statement made by Ms. Beasley regarding the authority of the individual stores and the alleged remark made by Ms. Preisch at the April meeting contained in Count III regarding the problems with approval from Dallas headquarters; and (4) the existence of a valid contract arising out of the April meeting contained in Count II. The plaintiff may be entitled to punitive damages on Count I and Count III, provided the statutory preconditions are met. A separate judgment will be issued in accordance with this opinion.

### JUDGMENT

For the reasons stated in the attached memorandum opinion, it is CONSIDERED, ORDERED and ADJUDGED that defendant J.C. Penney, Inc.'s motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part.