675 So.2d 1292 (1995)
LIBERTY NATIONAL LIFE INSURANCE COMPANY
v.
Edith N. McALLISTER.
1931163.
Supreme Court of Alabama.
February 24, 1995.
On Application for Rehearing April 7, 1995.
*1294 William J. Baxley and Joel E. Dillard of Baxley, Dillard and Dauphin, James W. Gewin and Michael R. Pennington of Bradley, Arant, Rose & White, Birmingham, Joseph C. Sullivan, Jr., David A. Boyett and James W. Tarlton III of Hamilton, Butler, Riddick, Tarlton & Sullivan, Mobile, for appellant.
Norman E. Waldrop, Jr. and M. Kathleen Miller of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., Mobile, for appellee.
INGRAM, Justice.
Edith N. McAllister sued Liberty National Life Insurance Company ("Liberty National"), alleging that Liberty National had induced her to switch an older Liberty National cancer insurance policy for a newer, more expensive cancer insurance policy, while fraudulently concealing that the newer policy reduced or eliminated important benefits available under the older policy. The trial court submitted to the jury McAllister's theories of misrepresentation, deceit, and fraudulent suppression. The jury awarded McAllister $1,000 in compensatory damages and $1,000,000 in punitive damages. The trial court entered a judgment on the jury's verdict and denied Liberty National's motions for JNOV, a new trial, or a remittitur. Liberty National appeals.
A jury's verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust. Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162 (Ala.1988). In addition, a judgment based upon a jury verdict and sustained by the denial of a motion for a new trial will not be reversed unless it is plainly and palpably wrong. Ashbee v. Brock, 510 So.2d 214 (Ala. 1987). Because the jury returned a verdict for McAllister, any disputed questions of fact must be resolved in her favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict. State Farm Auto. Ins. Co. v. Morris, 612 So.2d 440, 443 (Ala.1993). In short, in reviewing a judgment based upon a jury verdict, this Court must review the record in a light most favorable to the appellee. Continental Cas. Ins. Co. v. McDonald, 567 So.2d 1208, 1211 (Ala.1990).
*1295 Viewed in the light most favorable to McAllister, Continental Cas. Ins. Co., the record suggests the following:
McAllister, a widow, had been a Liberty National policyholder since 1947. In 1982, she purchased a Liberty National cancer insurance policy for herself; she also purchased an identical policy for her daughter. The 1982 policy provided coverage for various costs associated with cancer treatment; these included limited hospital expenses, surgical expenses, and private nursing costs. Of particular importance to this case, however, was the 1982 policy's coverage for expenses stemming from radiation, chemotherapy drugs, and prescription drugs. In the 1982 policy, Liberty National set no maximum limit for coverage of these expenses; therefore, Liberty National agreed to provide total coverage of these expenses.
Evidence at trial indicated that 65% to 80% of cancer patients are treated with radiation, chemotherapy, or a combination of the two. Prescription pain medication, described in trial testimony as the "dominant expense in taking care of long-term cancer patients," is used by 50% of those patients who continue treatment beyond their initial cancer treatment. The price of treatment by radiation, chemotherapy, and related prescription medication is very high. The prescription pain medication can cost up to $2 per dose; with several doses of different types of medication a day, the costs for a patient may easily reach over $1,000 a month. The cost of chemotherapy may range from nearly $700 to over $1,600 per day of treatment. Radiation and medicine relating to its use may cost over $3,600 a day during certain periods of the radiation treatment cycle. Expensive prescription anti-nausea and antibiotic medications are also used in these cancer treatments.
In the 1980s, Liberty National developed a steadily increasing amount of expenses stemming from claims under these full-coverage policies. At the same time, Torchmark Corporation, Liberty National's parent corporation, ordered Liberty National to cut its expenses. Liberty National then embarked on a program to persuade its cancer insurance policyholders to exchange the older policies for new cancer policies. These new policies increased coverage or created additional coverage in certain aspects; for example, the new policies provided a $2,000 cash payment for the first occurrence of cancer and provided coverage for certain "dread diseases," such as polio and tetanus, that was unavailable under the old policy. However, the new policies limited their coverage to $500 per day for radiation and chemotherapy treatments and $8,000 a year for prescription chemotherapy drugs; no coverage was provided for prescription anti-nausea, antibiotic, or pain medicine. One former Liberty National agent who participated in the exchange program stated the following:
"Q.... [W]hat were [you] taught you were supposed to do as a Liberty National agent?
"A.... We were showed just to highlight the benefits, the first occurrence benefits, the $2,000 up front and we showed them what they were going to get but we never showed them what they were going to lose.
"Q.... [W]ere you taught to ever show them what they were [to] give up?
"A. No, sir.
"Q. Were you taught not to tell them what they were giving up?
"A. Yes, sir.
"Q. Who taught you that?
"A. Sales managers."
In 1987, Rick McLendon, McAllister's Liberty National agent, told McAllister that the new Liberty National cancer policy "was a better policy and had better coverage" than her existing 1982 policy. According to McAllister, McLendon did not tell her that certain benefits under her 1982 policy would be limited or eliminated in the 1987 policy. McLendon filled out an application for the new policy, and McAllister signed it; McAllister did not review the policy at that time because, she stated, "I trusted him." McLendon gave McAllister a brochure describing the coverage provided by the new policy; while this brochure accurately stated the coverage provided, it made no comparison between the coverage of the 1982 policy and that of the 1987 policy. McAllister also exchanged the cancer policy that she had *1296 previously purchased for her daughter. In 1990 and 1991, McAllister again exchanged these policies for newer policies. The record indicates that Liberty National charged higher premiums for McAllister's new policies.
In 1992, McAllister's aunt, Grace Dismuke, was diagnosed with cervical cancer; Dismuke had also owned an older Liberty National cancer policy and had exchanged it for a newer policy. When Dismuke discovered that Liberty National would not cover many of her medical bills under her new policy, she discussed that fact with McAllister, who then compared her new policy with Dismuke's 1982 policy, which was identical to McAllister's 1982 policy. Concerning this comparison, McAllister stated:
"Q. Was that the first time you had ever tried to do that?
"A. Yes.
"Q. What did you look at when you tried to compare them?
"A. I looked at the benefits on the radiation and the chemotherapy and the drugs and realized that I did not have the one hundred percent coverage anymore.
". . . .
"Q. Ms. McAllister, if you had been told at the time that you purchased your 1987 policies that the benefits in the radiation coverage and the chemotherapy coverage and the prescription drug coverage were going to be less under the new policy would you have bought the policies in 1987?
"A. No, I would not."
On appeal, Liberty National first contends that the trial court erred in submitting McAllister's fraudulent suppression claim to the jury. Liberty National argues that the sales brochure its agent McLendon gave to McAllister in 1987 was a full disclosure of all material facts pertaining to the policies, and, therefore, that Liberty National was entitled to a judgment as a matter of law on that claim.
Fraud may be committed by the suppression of material facts. Ala.Code 1975, § 6-5-102, states:
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
To prove a prima facie case of fraudulent suppression, a plaintiff must show: (1) that the defendant had a duty to disclose an existing, material fact; (2) that the defendant had actual knowledge of the fact and its materiality; (3) that the defendant suppressed that fact; (4) that the plaintiff's lack of knowledge concerning that fact induced her to act; and (5) that she suffered actual damage as a proximate result of her acting. Hardy v. Blue Cross & Blue Shield, 585 So.2d 29, 32 (Ala.1991). A plaintiff attempting to prove fraudulent suppression need not prove an intent to deceive; the plaintiff has only to prove a breach of the defendant's duty to disclose the suppressed facts. Baker v. Bennett, 603 So.2d 928 (Ala. 1992). The question as to whether a duty to disclose exists is for the jury, "which should consider the relationship of the parties, the value of the particular facts suppressed, and the relative knowledge of each party." Baker, 603 So.2d at 935; see also Cowen v. M.S. Enterprises, 642 So.2d 453 (Ala.1994). In Baker, the Court noted that when one party has superior knowledge of a fact that is unknown to the other party, and the lack of knowledge will induce the other party to act in a manner in which he otherwise might not act, the obligation to disclose is "particularly compelling." Baker, 603 So.2d at 935.
The brochure for the new policy given to McAllister made no reference to the 1982 policy. It made no reference to the exchange of the policies. It made no comparison between the new policy and the 1982 policy that the new policy would replace. We hold that, under the circumstances of this case, the jury could find that Liberty National was under a duty to explain to McAllister the differences between the 1982 policy and the 1987 exchange policy before selling her the new policy, either through direct communication by its agents or through its sales brochure. McAllister testified that she had a cordial, trusting relationship with McLendon and other Liberty National agents. "Every *1297 month and sometimes in between," McAllister said, the agents would visit her home to drink coffee and sometimes have dinner. It is obvious from McAllister's testimony that she trusted Liberty National and its agents to sell its policies to her honestly; in other words, to help her understand the differences between her old policy and the new policy. Liberty National had the opportunity to explain the differences between the old policy and the new one, either through proper instruction of its agents or through its sales brochure, but it failed to do so. The sharp reduction in the 1982 policy's coverage of radiation and chemotherapy expenses, along with the elimination of coverage for non-cancer treating prescription drugs, makes the question as to whether Liberty National's 1987 policy brochure was a "full disclosure" of all material facts one of fact, not of law. Therefore, we hold that the court properly submitted this issue to the jury.
Liberty National next asserts that McAllister's claims were barred by the statute of limitations, because McAllister acquired the sales brochure and policies in 1987, more than two years before she filed this lawsuit.
A fraud action is subject to a two-year statute of limitations. Ala.Code 1975, § 6-2-38. However, the fraud claim accrues only when the plaintiff discovers the fraud or when the plaintiff, acting as a reasonable person, should have discovered the fraud. Ala.Code 1975, § 6-2-3; McGowan v. Chrysler Corp., 631 So.2d 842 (Ala.1993); Fabre v. State Farm Mut. Auto. Ins. Co., 624 So.2d 167 (Ala.1993). Whether a party discovered or should have discovered fraud, for purposes of the statute of limitations, is generally a question of fact for the jury. Massachusetts Mut. Life Ins. Co. v. Collins, 575 So.2d 1005 (Ala.1990); Green v. Wedowee Hosp., 584 So.2d 1309 (Ala.1991); Elrod v. Ford, 489 So.2d 534 (Ala.1986). "The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases in which the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." Hicks v. Globe Life & Accident Insurance Co., 584 So.2d 458, 463 (Ala.1991) (emphasis in original). This Court has stated that "`fraud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.'" Kelly v. Connecticut Mut. Life Ins. Co., 628 So.2d 454, 455 (Ala.1993), quoting Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989).
We hold that the trial court properly submitted to the jury the question of when McAllister, acting as a reasonable person, should have discovered the facts supporting her fraud claims. Although McAllister had had the Liberty National sales brochure and policies in her possession since 1987, she testified that she did not learn of the coverage reductions of the new policy until 1992, when her aunt contracted cancer and received bills not covered by the aunt's substituted Liberty National policy. It was at that point that McAllister compared the 1982 policy with the new policy. McAllister had no reason until then to question the coverage of her new policy, because, she says, she relied upon McLendon's assurances that the new policy provided "better coverage." The question of whether a reasonable person in McAllister's situation should have discovered the fraud when she received the 1987 policy and sales brochure, rather than when she compared the policies after her aunt's illness, was a question of fact for the jury. There was no proof that McAllister actually knew of facts that would have put a reasonable person on notice of fraud before 1992; therefore, the trial court did not err on this issue. Hicks, supra.
Liberty National next argues that the trial court erred in denying its motion for a change of venue from Mobile County, because of what it deems "adverse publicity" in Mobile County surrounding its cancer policy exchange program.
The most common procedure by which this Court reviews a trial court's ruling on a motion for a change of venue is to petition for a writ of mandamus; however, this is not the exclusive procedure for review of such a ruling. The ruling can also be reviewed on direct appeal. Elmore County *1298 Comm'n v. Ragona, 540 So.2d 720 (Ala.1989). A determination on a motion for a change of venue is a matter within the sound discretion of the trial court. Ex parte Gold Kist, Inc., 491 So.2d 869 (Ala.1985). After reviewing the record, we conclude that the trial court did not err in denying Liberty National's motion for a change of venue.
Liberty National next argues that the trial court erred in permitting evidence of damage suffered by McAllister's aunt, Grace Dismuke.
The testimony of Dismuke and McAllister concerning Dismuke's experience with her substituted Liberty National cancer policy simply demonstrated that Dismuke also had been persuaded to exchange her policy in 1987, and that, when she contracted cancer, the new policy left many of her medical bills unpaid. On the question whether a party committed a particular fraudulent act, proof may be made that the party committed similar fraudulent acts against other persons near the same time that appear to be part of a common scheme to defraud. We have generally held that evidence of other fraudulent transactions is admissible to show fraud, motive, scheme, or intent. C. Gamble, McElroy's Alabama Evidence § 70.03(1) (4th ed. 1991); Kabel v. Brady, 519 So.2d 912 (Ala. 1987). The trial court did not err on this issue.
Liberty National next argues that the trial court erred in denying its motions for a mistrial. It contends that McAllister's counsel failed to timely produce an insurance application made by McAllister to another insurer and that McAllister's counsel made prejudicial comments during closing argument.
Because declaring a mistrial is a drastic measure, this Court will not reverse a trial court's ruling on a motion for a mistrial unless it is absolutely clear that its discretion has been abused. Wright v. Terry, 646 So.2d 11 (Ala.1994); Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala.1992). McAllister's attorneys sent Liberty National's attorneys a copy of the application approximately four days before trial. The record does not indicate a willful failure to produce the application; instead, it appears that McAllister's counsel did their best to timely produce all of McAllister's insurance papers for defense counsel. The trial court did not abuse its discretion in refusing to declare a mistrial on this basis. Further, after reviewing the comments of McAllister's counsel during closing arguments, we find them not to warrant a mistrial. The trial court did not abuse its discretion in denying Liberty National's motions for a mistrial.
Liberty National next contends that McAllister failed to prove damage as a result of its conduct.
McAllister has never submitted a claim under her substituted Liberty National cancer policy. However, as was stated by this Court in Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580 (Ala.1994), "the insurer cannot be allowed to profit from its fraud simply because the insured is `lucky' enough never to have to `use' the coverage." The fraud was complete when the fraudulent transaction occurred; the damage was McAllister's payment of premiums on the substituted policies while receiving reduced coverage or no coverage for certain treatments that had been covered by the earlier policies. This is sufficient damage upon which to base a fraud claim; therefore, Liberty National's argument is without merit. Boswell, supra; Willingham v. United Ins. Co. of America, 628 So.2d 328 (Ala.1993).
Finally, Liberty National contends that the trial court "failed to give the jury verdict ... close and meaningful independent scrutiny" after Liberty National moved for a JNOV, a new trial, or a remittitur.
We find this issue to be without merit as well. The trial court conducted a hearing and issued a written order denying the motion for a JNOV or a new trial. In that order the trial court also reviewed the jury's verdict, pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989); it found that the evidence supported the jury's verdict. This Court's review of the facts of this case indicates that the trial court did not err in refusing to disturb the verdict.
*1299 For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
MADDOX and BUTTS, JJ., concur.
HOUSTON, J., concurs specially.
COOK, J., concurs in the result.

On Application for Rehearing
INGRAM, Justice.
APPLICATION OVERRULED.
MADDOX, HOUSTON, KENNEDY, COOK and BUTTS, JJ., concur.
HOUSTON, J., substitutes an amended special concurrence for that issued on February 24, 1995.
HOUSTON, Justice (concurring specially).
For purposes of the statute of limitations, fraud is "discovered" as a matter of law when one receives documents that would put one on such notice that the fraud reasonably should have been discovered. Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989).
Liberty National contends that the essence of Edith McAllister's claim, based on multiple causes of action, is that Liberty National wrongfully induced her to exchange existing cancer policies for new policies by not disclosing certain monetary limits upon radiation, chemotherapy, and drug benefits under the new policies.
Liberty National's "Exhibit 2" is a brochure given to McAllister in 1987, when she changed policies. This brochure read:
"BENEFITS FOR WE PAY
".... ....
"Radiation and All charges in and
Chemotherapy out of hospital up to
 $500 per day. No
 maximum lifetime
 limit.
"Prescription Chemotherapy/drugs All charges for cancer
 fighting drugs
 and medicines prescribed
 up to $8,000
 per year. No maximum
 lifetime limit."
Therefore, if the "essence" of McAllister's claim was as asserted by Liberty National, I would agree that the fraud should have been discovered when McAllister received Liberty National's brochure and I would agree that her claims were time-barred. However, from studying the complaint, as amended, and McAllister's brief, I believe that the essence of her claim was that the insurance agent represented to her "that Liberty National had `come out with a new cancer policy' which provided `better benefits and better coverage'" than her existing policies and that the new cancer policy "had been put together by Liberty National to compensate for and cover `rising medical costs and new cancer treatments which were being discovered.'" It is without dispute that Liberty National did not furnish McAllister with a comparison of the benefits under her existing policies and the benefits under the new policies. The evidence, viewed most favorably to McAllister, as required by our standard of review, established that Liberty National sought to keep that information from McAllister. Therefore, it was for the jury to determine whether McAllister's claim was time-barred.
This was a "pattern and practice" case, as was BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994). In my special concurrence in Gore, 646 So.2d at 630, I wrote:
"Because evidence of BMW NA's pattern and practice was introduced in each case, an award of punitive damages in either case based upon this pattern and practice would sufficiently punish BMW NA for this conduct, and any additional punishment of BMW NA for this conduct would have serious problems under the United States and Alabama Constitutions. Some courts have refused to strike punitive damages awards merely because they constituted repetitive punishment for the same conduct. See, e.g., Dunn v. HOVIC, 1 F.3d 1371, 1385 (3d Cir.1993). However, when a punitive damages award is obviously based upon the totality of a defendant's pattern and practice, as it is in this case..., we have in effect held that punishment for this course of conduct by BMW NA in excess of $2,000,000 violates `some' substantive due process. I believe that to *1300 allow any additional punitive damages award against BMW NA in regard to the sale of any of the 983 vehicles may violate numerous constitutional rights."
I believe that to allow any additional punitive damages award against Liberty National for the entire "pattern and practice" of conduct upon which McAllister's award was based may violate numerous rights guaranteed Liberty National by the United States and Alabama Constitutions.