RICHARD L. HOLMES, Retired Appellate Judge.
On February 26,1993, Hazel Parker filed a multi-count complaint against Peter Weston, individually, and d/b/a WESBAN Financial Consultants; American Agri-Corp; Fred Behrens; Robert Wright; and George L. Schreiber (hereinafter collectively referred to as defendants). Parker substituted the estate of George L. Schreiber after the defendants filed a suggestion of death, which provided notice of the death of Schreiber.
The complaint alleged fraud, deceit, suppression of material facts, false representations, breach of contract, fraudulent inducement to contract, breach of fiduciary duty, and conspiracy to defraud on the part of the defendants.
The defendants filed answers to the complaint and maintained that Parker’s claims were barred by the applicable statutes of limitations. Thereafter, the defendants filed a motion for a summary judgment, along with depositions, affidavits, other evidentiary submissions, and a brief in support of their summary judgment motion. The defendants maintained that there was no genuine issue of a material fact and that they were entitled to a judgment as a matter of law because, they said, Parker’s claims were barred by the applicable statutes of limitations.
Parker filed a brief in opposition to the summary judgment motion, along with affidavits and depositions in support of her position. Thereafter, the trial court issued an order, entering a summary judgment in favor of the defendants.
Parker appeals. This ease is before this court pursuant to Ala.Code 1975, § 12-2-7(6).
On appeal Parker contends that the summary judgment was improper in this ease because, she says, there existed a genuine issue of a material fact regarding whether the statute of limitations for fraud had been tolled or whether she should have discovered the alleged fraud more than two years prior to the filing of the present action.
Our review of the record reveals the following pertinent facts: In the spring of 1983, Liberty National Life Insurance Company (Liberty National) offered early retirement to Parker, a 35-year employee. At the time of her retirement in May 1983, Parker was 56 years of age and was an executive assistant/seeretary to a senior vice president at Liberty National.
The financial package offered by Liberty National gave Parker the opportunity to receive a one-time payment of $50,000 as an incentive for early retirement. This incentive was over and above the $92,000 that Parker had in her retirement account at Liberty National. Liberty National gave Parker the option of placing the money in an annuity with Liberty National or taking her money in a lump-sum distribution.
Parker testified that because she did not understand the financial aspects of her choices, she sought the services of a financial planner to aid her in making her decision. Parker indicated that a friend recommended Weston “as a good Christian man and a very knowledgeable financial planner.” In either April or May 1983, Parker met with Weston, who owned WESBAN Financial Consultants (WESBAN).
Parker stated that at this initial meeting, she discussed her goals and needs with Weston. Parker was not old enough to qualify for Social Security benefits, and her husband did not have a steady income. Parker stated that she told Weston that she wanted “things set up” in such a way that she and her husband would have regular income to meet living expenses.
Parker testified that she “didn’t know anything about financial planning” and that she “left it up to [Weston] to do what was best for [her].” In her affidavit Parker stated, “I trusted Weston during this period of time and thought that he was a good Christian man. When I visited with Weston, we often prayed together.” Weston admitted that he *13 prayed regularly with Parker “to seek the Lord’s guidance for discernment in the way [they] operate[d], and for help with the resources.” Weston indicated that he prayed with Parker because he “knew her to be a member of a Christian church.”
On May 31, 1983, Parker executed a service agreement with WESBAN and paid her first-year retainer of $3,000. Thereafter, Parker acted upon Weston’s advice and liquidated her retirement plan at Liberty National. Parker received $92,000 in a lump-sum payment from her retirement plan, in addition to the $50,000 retirement incentive cash payment.
Weston recommended that Parker invest in Dixie Pecan Associates (Dixie Pecan), a California limited partnership formed for the purpose of acquiring and operating pecan orchards and other agricultural pursuits. American Agri-Corp was the managing agent of Dixie Pecan. Behrens, Schreiber, and Wright were the general partners in Dixie Pecan.
On September 1, 1983, Parker followed Weston’s recommendation and invested $55,-000 in Dixie Pecan as a tax shelter. Parker’s investment purchased 55 units in Dixie Pecan.
Parker testified that no one advised her of the risks associated with such an investment before she invested in Dixie Pecan. Parker also testified that Weston told her the following regarding the benefits of her investment:
“[A]fter two years of being in the Dixie Pecan that [she] would receive five thousand annually for eight to ten years, and at the time they sold it, after eight to ten years, that [she] would receive [her] fifty-five thousand back plus any profits that were made would be divided among the partners.”
Parker recalls receiving a Confidential Private Placement Memorandum (placement memo) from Dixie Pecan in 1984, after she had invested in Dixie Pecan. The placement memo outlined the minimum income requirements for investors who were considering the purchase of limited partnership interests in Dixie Pecan.
Parker stated that when she received the placement memo in 1984, she filed it without reading it. Parker admitted that she chose to file the placement memo without reading it and that no one ever told her that she did not need to read the placement memo. Parker repeatedly stated that she trusted Weston to do whatever was best for her.
Parker testified that she did not receive any dividend payments from Dixie Pecan between 1985 and 1990. Parker further testified that she called Weston once or twice each year to inquire as to the reason she did not receive her dividend payments. Parker indicated that Weston always gave her explanations that sounded reasonable and believable as to why there were no dividends— blight or periods of low rain, which caused a lower production of pecans for the year, no profits were made because the prices for pecans were so low, ete. Parker stated that Weston would always assure her that she would begin receiving dividend payments the following year. Parker indicated that the last time she spoke with Weston was in 1990 because in 1991 she learned that Weston had defrauded her.
Although Parker did not receive any dividend payments, she did receive K-l Partnership Schedules (tax information) from American Agri-Corp for the years 1983 through 1990. This tax information for the years 1986 through 1990 showed ordinary income, ranging from $607 to $11,665, attributable to Parker’s interest in Dixie Pecan.
Parker testified that each year she would give this tax information to her son, Sammy, without looking at it. Parker further testified that Sammy prepared the Parkers’ federal income tax returns during this period.
Parker indicated that after receiving the 1990 tax information, Sammy recommended that she have her 1990 tax return prepared by an accountant who prepared tax returns. Parker stated that Sammy made this recommendation because he thought she might have some tax liability due to her partnership in Dixie Pecan.
Consequently, in March 1991 Parker took her 1990 tax information to Charles Morgan, a CPA who had previously been an accoun *14 tant for WES BAN. Parker said that Morgan told her that Weston had defrauded her and that she should never have been advised to invest in Dixie Pecan. It was during one of her meetings with Morgan that Parker first read the placement memo. Parker testified to the following in her deposition:
“[Morgan] read [the placement memo] and I read [the placement memo] at one particular place where it said you would not be eligible unless you had a certain amount of money. That’s when I knew.”
As previously noted, it is undisputed that the placement memo had been in Parker’s possession since 1984, but that she did not choose to read it until 1991. We find the following pertinent statement in Parker’s affidavit:
“It was at this time [March 1991] that [Morgan] showed me the ‘suitability’ on page three of the [placement memo]. When I read it, I did not understand what it meant or if it should have any effect on me. If I had read this ‘suitability’ information in 1984 I would not have understood it, and would have believed Weston if he had told me that I was qualified for [Dixie Pecan].
“Morgan explained to me for the first time in March 1991 that I was not suitable, and told me what this ‘suitability’ information meant. I was not qualified for [Dixie Pecan] in 1983, and Weston should not have invested my money in [Dixie Pecan]. However, when I read this ‘suitability’ information today, I still do not understand it completely. The language contains words that I do not understand.”
Pertinent portions of the placement memo are contained in the record before this court. The following paragraph is found on the first page of the introduction section of the placement memo:
“THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE LIMITED TO PERSONS WHO MEET CERTAIN REQUIREMENTS AS TO FINANCIAL ABILITY TO BEAR THE ECONOMIC RISK OF INVESTMENT AND KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS. (SEE ‘SUITABILITY STANDARDS.’)”
We find the “suitability standards” on page three of the placement memo. These “suitability standards” state the following:
“Only those prospective investors with the capacity to satisfy one of the following two suitability guidelines will qualify for consideration by the Issuer for investment in the Units offered hereby:
“(1) a net worth of at least $250,000 (exclusive of home, furnishings, and automobiles), or
“(2) a net worth of at least $100,000 (exclusive of home, furnishings, and automobiles) and had during the last taxable year, and expects to have during the current taxable year, a minimum gross income of $50,000.”
It is Parker’s contention that she had no actual knowledge of Weston’s fraud until 1991 when she met with Morgan and that her complaint was timely filed because she filed her complaint within a two-year period after learning of the fraud. Parker further contends that the question of when she should have discovered the fraud is one for the jury and that the trial court should not have entered a summary judgment in favor of the defendants.
Our supreme court stated the following in Liberty Nat’l Life Ins. Co. v. McAllister, 675 So.2d 1292, 1297 (Ala.1995):
“A fraud action is subject to a two-year statute of limitations. However, the fraud claim accrues only when the plaintiff discovers the fraud or when the plaintiff, acting as a reasonable person, should have discovered the fraud. Whether a party discovered or should have discovered fraud, for purposes of the statute of limitations, is generally a question of fact for the jury. ‘The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases in which the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud.’ ([E]mphasis in original). This Court has stated that ‘ “fraud is discoverable as a matter of law for purposes'of the statute of limitations when one receives documents that would put one on such *15 notice that the fraud reasonably should be discovered.” ’ ”
(Citations omitted.)
Additionally, we would note that our supreme court also made the following statements in Liberty Nat'l Life Ins. Co., 675 So.2d at 1297:
“We hold that the trial court properly submitted to the jury the question of when McAllister, acting as a reasonable person, should have discovered the facts supporting her fraud claims. Although McAllister had had the Liberty National sales brochure and policies in her possession since 1987, she testified that she did not learn of the coverage reductions of the new policy until 1992, when her aunt contracted cancer and received bills not covered by the aunt’s substituted Liberty National policy. It was at that point that McAllister compared the 1982 policy with the new policy. McAllister had no reason until then to question the coverage of her new policy, because, she says, she relied upon McLen-don’s assurances that the new policy provided ‘better coverage.’ The question of whether a reasonable person in McAllis-ter’s situation should have discovered the fraud when she received the 1987 policy and sales brochure, rather than when she compared the policies after her aunt’s illness, was a question of fact for the jury. There was no proof that McAllister actually knew of facts that would have put a reasonable person on notice of fraud before 1992; therefore the trial court did not err on this issue.”
(Citations omitted) (emphasis added).
In light of the foregoing, we find the following to be a question of fact for the jury: Whether a reasonable person in Parker’s situation should have known before 1991 of facts that would have put a reasonable person on notice of fraud. Consequently, we reverse the trial court’s judgment and remand the cause to the trial court for proceedings consistent with this opinion.
The foregoing opinion was prepared by Retired Appellate Judge RICHARD L. HOLMES while serving on active duty status as a judge of this court under the provisions of Ala.Code 1975, § 12-18-10(e).
REVERSED AND REMANDED.
All the judges concur.