Nicholas M. CASASSA, Plaintiff,

v.

**LIBERTY LIFE INSURANCE COMPANY, Defendant.**

Civil Action No. 96–A–290–S.

United States District Court,
M.D. Alabama,
Southern Division.

Dec. 31, 1996.

Richard E. Crum, Dothan, AL, Lynn W. Jinks, Union Springs, AL, for plaintiff.

Peter S. Fruin, Montgomery, AL, B. Clark Carpenter, Talladega, AL, for defendant.

### MEMORANDUM OPINION

ALBRITTON, District Judge.

## I.  INTRODUCTION

This cause is before the court on the Motion for Summary Judgment filed by defendant Liberty Life Insurance Company ("Liberty Life") on October 15, 1996.

Nicholas M. Casassa ("Casassa") filed this action in the Circuit Court of Houston County, Alabama on January 23, 1996 naming Liberty Life as defendant. On February 21, 1996, Liberty Life removed to this court pursuant to 28 U.S.C. § 1446(b). On April 4, 1996, Casassa amended his Complaint ("First Amended Complaint"),[1] bringing claims of fraudulent misrepresentation[2] (Count One), fraudulent suppression (Count Two), breach of fiduciary duty (Count Three), conversion (Count Four), breach of contract (Count Five), and negligent and/or wanton supervision (Count Seven).[3]

On October 15, 1996, Liberty Life filed a Motion for Summary Judgment contending that the applicable statutes of limitations bar all counts of the First Amended Complaint.[4] Alternatively, Liberty Life contends that: Count Two is barred as a matter of law because the information allegedly suppressed was given to Casassa; Count Three is barred as a matter of law because a fiduciary relationship did not exist at the time of the alleged breach; Count Five is barred as a matter of law because the contract was not breached; and Count Seven is barred as a matter of law because Casassa cannot support this claim with any evidence.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, based upon the parties' diversity of citizenship and an amount in controversy exceeding $50,000.00, exclusive of interest and costs.

For the reasons that follow, the court finds the Motion for Summary Judgment is due to be GRANTED.

## II.  FACTS

Submissions before the court, including deposition testimony and documentary evidence, establish the following facts:

Casassa is an Alabama resident. Liberty Life is a South Carolina insurance corporation qualified to do business in Alabama.

Prior to April 1986, Casassa owned several life insurance policies issued by Metropolitan Life Insurance Company and Prudential Insurance Company. Casassa testified in deposition that these policies had been in place for several years, were paid-in-full, and had a death-benefit value of approximately $20,000.00. Casassa further testified that prior to April 1986 he never had a policy with Liberty Life, nor had he ever dealt with Drew Mercier ("Mercier").

Casassa testified that in April 1986 Mercier, whom Casassa believed was an agent of Liberty Life, approached Casassa regarding the possibility of purchasing Liberty Life insurance. Casassa testified that before purchasing a policy, Mercier provided to Casassa various illustrations regarding potential policies. Each illustration showed a $50,000.00 life insurance policy with annual premium payments. Casassa testified that he told

---

1. By granting Casassa's First Motion for Leave to Amend, filed on April 2, 1996, the court on April 4, 1996 denied as moot the Motion to Dismiss or in the Alternative for More Definite Statement, filed on February 26, 1996.

2. The court deems Casassa's misrepresentation claim to be a fraudulent misrepresentation claim because Casassa bases his misrepresentation claim on fraudulent conduct.

3. The First Amended Complaint does not contain a Count Six.

4. The Motion to Dismiss Counts Three, Four, Five, and Seven of Casassa's First Amended Complaint, filed by Liberty Life on April 12, 1996, is converted into the Motion for Summary Judgment, and is DENIED as moot.

Mercier that he did not want to change his existing insurance because those policies were nearly paid-in-full and he could not afford to make premium payments on new insurance. Casassa testified that in response to Casassa's concern, Mercier assured Casassa that he could have a paid-up $50,000.00 life insurance policy with Liberty Life in exchange for a one-time payment of $15,000.00, to be derived by Casassa cashing in some of his original policies. Casassa testified that Mercier told him that paying premiums would be "just like putting money in the bank" and that if he did not wish to make premium payments, he could just "throw [a bill] away" and "forget [about paying] it." Casassa further testified that Mercier assured him that his cash value would increase annually. Liberty Life denies that Mercier made these two misrepresentations.

Casassa testified that he relied on Mercier's representations when he completed and signed an application for insurance with Liberty Life on April 28, 1986. The application states that there is an annual insurance premium of $2,055.00 ($2,786.88, as amended). Moreover, the application states that only the President, a Vice President, the Secretary, or an Assistant Secretary of Liberty Life could make a contract on Liberty Life's behalf. The application also states that no waiver or modification of a contract provision or any of Liberty Life's rights or requirements could be binding on Liberty Life unless it is in writing and signed by one of the above officers.

On July 17, 1986, Liberty Life issued a $50,000.00 insurance policy, # XF10108162, ("the Policy"), to Casassa after he paid Liberty Life $15,000.00. Casassa testified that he had the Policy in his possession as early as sometime in the fall of 1986. The Policy states that there is a planned annual premium of $2,786.88. The Policy also states that there is a guaranteed interest rate of 4% that produces income on the reserve amount, and the Policy will lapse if the cash value is insufficient to make the annual premium payment. Beginning in 1987, Liberty Life also sent annual reports regarding the Policy to Casassa, who testified that he "looked at" the reports upon receipt.

Casassa testified that he did not understand much of the language written in the Policy and the reports, and only understood some of the language when it was broken down to him at deposition by Liberty Life's counsel. Casassa further testified that only after that time did he understand that there is language in the Policy and reports that is inconsistent with Mercier's alleged misrepresentations.

Liberty Life's records indicate that Casassa made $500.00 payments on the Policy in each of the first two years that he held the Policy, but after that made no premium payments. For several years, the interest income on the Policy's reserve amount was sufficient to make the annual premium payments. However, as documented in the annual report that covers July 17, 1994 to July 16, 1995 ("the 1995 Report"), the premium payment due exceeded the interest income, and the Policy's reserve amount and cash value declined. Casassa testified that he first realized that the Policy may be inconsistent with Mercier's representations when he received the 1995 Report. Soon thereafter, Casassa contacted an attorney and filed this lawsuit against Liberty Life.

### III. *SUMMARY JUDGMENT STANDARD*

The purpose of a motion for summary judgment is to challenge the contention that a case presents a genuine issue of material fact necessitating a trial. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion." *Id.* at 323, 106 S.Ct. at 2553. Accordingly, summary judgment is appropriate if the movant demon-

strates that the non-movant has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552; *Tidmore Oil Co. v. BP Oil Co.,* 932 F.2d 1384, 1387–88 (11th Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991).

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case does indeed exist. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. It must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## IV. DISCUSSION

### A. Counts One, Two, and Three—The Fraudulent Misrepresentation, Fraudulent Suppression, and Breach of Fiduciary Duty Claims

■ In Counts One, Two, and Three, Casassa claims that Liberty Life is liable for fraudulent misrepresentation, fraudulent suppression, and breach of fiduciary duty, respectively. Actions for fraudulent misrepresentation, fraudulent suppression, and breach of fiduciary duty are subject to a two-year statute of limitations, Ala.Code 1975, § 6–2–38, but only begin to run when a plaintiff actually discovers or reasonably should have discovered the fraud.[5] *See Liberty Nat'l Life Ins. Co. v. McAllister,* 675 So.2d 1292, 1297 (Ala.1995) (citing Ala.Code 1975, § 6–2–3[6]), *cert. denied,* —— U.S. ——, 116 S.Ct. 688, 133 L.Ed.2d 593 (1995).

■ Generally, the question of when a plaintiff discovered or should have discovered the fraud is to be decided by the trier of fact. *Id.* (citations omitted). It is only appropriate to take this question away from the trier of fact and decide it as a matter of law "where the plaintiff actually knew of facts that would put a reasonable person on notice of fraud." *Hicks v. Globe Life and Accident Ins. Co.,* 584 So.2d 458, 463 (Ala.1991) (per curiam) (citations omitted). The Alabama Supreme Court has stated that fraud is "discoverable as a matter of law" when a person receives documents that would put a reasonable person on notice of the fraud. *McAllister,* 675 So.2d at 1297 (internal quotations and citations omitted). However, "documents that are vague or that do not reasonably indicate that a fraud has occurred, based on the circumstances of each case, will not 'warrant

---

5. In their submissions, both parties treat the fraudulent misrepresentation, fraudulent suppression, and breach of fiduciary duty claims in single discussions for purposes of discussing the statute of limitations. Because the breach of fiduciary duty claim arises from fraudulent conduct, this court will adopt the parties' view that the breach of fiduciary duty claim accrues when Casassa actually discovered or reasonably should have discovered the alleged fraud.

6. Ala.Code 1975, § 6–2–3 provides that "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."

a finding that the fraud claim is barred as a matter of law.' " *Kelly v. Connecticut Mut. Life Ins. Co.*, 628 So.2d 454, 458 (Ala.1993) (quoting *Hickox v. Stover*, 551 So.2d 259, 262 (Ala.1989) (per curiam)).

■ Here, Casassa is literate and has a high school education. He had the Policy in his possession beginning in the fall of 1986, but it is unclear whether he read the Policy. The Policy states on page three that the planned periodic premium is $2,786.88, payable annually. At the bottom of that page is the following note: "It is possible that coverage will expire prior to the paid-up age shown where either no premiums are paid following payment of the initial premium or subsequent premiums are insufficient to continue coverage to such age." The Policy provides that the paid-up age is ninety-five years old. In addition, the Policy states on page seven, in a section titled "Premium Provisions," that

> If the cash value less any indebtedness (net of unearned interest) on a monthly anniversary day is insufficient to cover the monthly deduction for the month beginning with such day and one month's interest on any indebtedness, a grace period of 60 days from such anniversary day shall be allowed for the payment of a sufficient premium.... If such premium remains unpaid at the end of the grace period this policy will lapse and be of no further value.

Although the Policy is inconsistent with Mercier's alleged misrepresentation that the Policy only requires a one-time payment of $15,000.00, it is unclear whether Casassa read the Policy upon receipt. In Alabama, "plaintiffs seeking to take advantage of Ala. Code § 6–2–3's saving clause have the affirmative burden of proving lack of notice." *Walker v. Transouth Fin. Corp.*, CV–95–A–672–N, 1996 WL 406836, at *21 (M.D.Ala. July 10, 1996) (citing *Johnson v. Shenandoah Life Ins. Co.*, 291 Ala. 389, 281 So.2d 636, 642 (1973)). *Also see Fabre v. State Farm Mut. Auto. Ins. Co.*, 624 So.2d 167, 169 (Ala.1993). This court recently noted that "In cases where a plaintiff never denies reading a document that is delivered to him, ... the plaintiff is deemed to have read the document unless he affirmatively puts forward evidence

to the contrary." *Walker*, 1996 WL 406836, at *21. Casassa testified in deposition that upon receipt he folded up the Policy and stored it away. This testimony may be construed as affirmative evidence that Casassa did not read the Policy. Based on this court's analysis in *Walker* and the fact that *Walker* settled before the Alabama Supreme Court could answer the questions certified to it by this court, it is still unclear whether a person, relying upon a misrepresentation, who receives but does not read a document that reasonably indicates that fraud has occurred, can, as a matter of law, be considered as having discovered the fraud for statute of limitation purposes. Therefore, it is unclear whether the court can find as a matter of law that Casassa discovered the alleged fraud based solely on his receiving the Policy.

However, Casassa also received annual reports regarding the Policy beginning in 1987. In particular, Casassa testified that he received in the summer of 1988 an annual report that covers July 17, 1987 to July 16, 1988 ("the 1988 Report"). Casassa further testified that he "looked at" the 1988 Report and has not denied that he read that Report upon receipt. Because Casassa has not submitted affirmative evidence to the contrary, the court deems Casassa as having read the 1988 Report upon receipt.

The 1988 Report defines several terms that will be important in the court's discussion. "Coverage charges" are defined as "the accummulated actual charges for that coverage during that period." "Cash value" is defined as "[t]he reserve value of your policy less any applicable surrender charges." "Reserve" is defined as "[t]he accummulated value of your policy before deducting any applicable Surrender Charge." Lastly, "Surrender Charge" is defined as "[a] fee to be deducted when part or all of the reserve is withdrawn."

The 1988 Report projects the Policy's future cash value and these projections are based on various interest rates producing income on the reserve amount. However, such projections only apply "if you pay all premiums as planned." The "premium as planned" statement contradicts Mercier's alleged misrepresentation that Casassa would

not have to pay any premiums because the Policy would be completely paid-up by the $15,000.00 payment.

In addition, specific income and deductions itemized in the 1988 Report contradict Mercier's alleged misrepresentation that the Policy's cash value will not decrease. Although the 1988 Report indicates that both the cash value and reserve amount increased during the period by $1,148.03, that increase reflects guaranteed interest income of $632.68, excess interest income of $750.74, and $500.00 in premium payments, less $663.39 in coverage expenses and $72.00 in expense charges. The 1988 Report indicates that the guaranteed interest income is 4% of the reserve amount and the excess interest income was 4.75% (8.75% less 4%). The 1988 Report also indicates that the reserve amount and cash value increased during the period because of income generated by a high interest rate and premium payments made. If Casassa had not made a premium payment during the period and if his interest rate on the reserve amount was only 4% (the guaranteed minimum), then the income on the reserve amount ($632.68) would not be sufficient to completely offset the coverage and expense charges ($735.39), and the Policy's cash value and reserve amount each would have decreased by $102.71. Such a situation occurred during the period covered by the 1995 Report. Because Casassa paid no premiums and because the interest rate was 5.5%, only $967.22 was generated as income during that period and was insufficient to completely offset the coverage and expense charges of $1,587.38. As a result, the cash value and reserve amount each decreased by $620.16 for that period.

In a similar case, *Gray v. Liberty Nat'l Life Ins. Co.*, 623 So.2d 1156 (Ala.1993), an insured purchased an insurance policy and allowed the insurer to withdraw premium payments directly from his personal checking account. The insurer thereafter began to withdraw money to pay premiums on an additional policy which allegedly was never purchased by the insured. Over a decade later, the insured discovered the fraud and filed a lawsuit. Although the insured claimed that he discovered the fraud just prior to filing suit, the Alabama Supreme Court affirmed a grant of summary judgment in part by the trial court on the basis that the statute of limitations barred the insured's claim. In reaching its decision, the Alabama Supreme Court observed that

> In March 1978, the increased … withdrawal actually caused an overdraft of [the plaintiff's] account, for which he paid a fee to the bank. For the next 12 years, [the plaintiff] continued to receive detailed bank statements that, upon a cursory examination, would have revealed that [the insurer] was withdrawing premiums for an additional policy. He also continued to receive canceled drafts for this amount. The record shows that [the plaintiff] is literate and he was capable of managing his affairs throughout this 12-year period. Based on these facts, we must conclude that a reasonable person of ordinary prudence would have discovered the alleged fraud in 1978 or within one year thereafter.

*Gray*, 623 So.2d at 1159 (citations omitted).

Likewise, a cursory examination of the 1988 Report read by Casassa upon receipt reveals that Liberty Life required that Casassa pay premiums, termed "coverage charges," if interest income on the reserve amount did not completely offset the coverage and expense charge, in order to avoid the Policy's cash value from decreasing. Although the 1988 Report may be more complex than the documents received by the plaintiff in *Gray*, the 1988 Report is not vague and is not so complex that it "do[es] not reasonably indicate that a fraud has occurred…." *See Kelly*, 628 So.2d at 458. As a literate man with a high school education, Casassa, by reading the 1988 Report, was capable of understanding that the Policy possibly could require more than a mere one-time premium payment of $15,000.00 based upon a decrease in the interest rate. Even if a reasonable person would not understand the particular intricacies of the alleged fraud based on a cursory examination of the 1988 Report, a reasonable person based on such an examination would know of facts to realize that there may be fraud. *See McGowan v. Chrysler Corp.*, 631 So.2d 842, 845 (Ala.1993)

("[I]t is the knowledge of such facts that would have alerted a reasonable person to the existence of a potential fraud, and not actual knowledge of the fraud itself, that determines whether the question of the tolling of the limitations period in a fraud case can be decided as a matter of law."). Certainly, the detailed 1988 Report was inconsistent with an alleged misrepresentation that Casassa could pay $15,000.00 and from that time on and forever more be insured for $50,000.00 with absolutely no further obligation on his part. A reasonable person would at least have been alerted to the existence of a potential fraud.

Therefore, the court finds that the fraudulent misrepresentation, fraudulent suppression, and breach of fiduciary duty claims are barred as a matter of law by the statute of limitations because the claims were filed more than two years after Casassa read the 1988 Report, a document that would put a reasonable person on notice of fraud. Accordingly, summary judgment on Casassa's fraudulent misrepresentation, fraudulent suppression, and breach of fiduciary duty claims is due to be GRANTED.

## B. *Count Four—The Conversion Claim*

In Count Four of his First Amended Complaint, Casassa claims that Liberty Life converted "monies in the form of the value of his original life insurance policies and built-up cash values." Casassa testified in deposition that he could not state any other property that Liberty Life converted. Consequently, the court will disregard Casassa's allegations in his briefs that Liberty Life converted the Policy's cash value and dividends every year the Policy has been in existence because, as the non-movant, Casassa has failed to present affirmative evidence supporting those allegations. Furthermore, the only property alleged in Count Four as having been converted is the value of the original life insurance policies. This argument goes beyond the claim made in the First Amended Complaint.

■ An action for conversion is subject to a six-year statute of limitations. Ala.Code 1975, § 6–2–34. A conversion claim generally accrues at the time the conversion occurs. *See generally Kelly,* 628 So.2d at 460–61. Because the alleged conversion took place when Casassa used the cash values of the original policies to purchase the Policy in 1986, nine and one-half years before this action was filed, Casassa's conversion claim is barred by the statute of limitations. Accordingly, summary judgment on Casassa's conversion claim is due to be GRANTED.

## C. *Count Five—The Breach of Contract Claim*

In Count Five of his First Amended Complaint, Casassa claims that Liberty Life breached a contract of insurance "by converting the cash values that had built up in the original policies and failing to account to [Casassa] therefore (sic)" and "by failing to provide him with a policy that would not lapse at a certain age, based upon a single premium of $15,000.00." Casassa testified in deposition that these were his only two allegations for breach of contract and each occurred in 1986. As a result, the court will disregard Casassa's allegations in his briefs that Liberty Life breached the contract each time it failed to credit dividends and each time it deducted part of the cash value because, as the non-movant, Casassa has failed to present affirmative evidence supporting those allegations. Furthermore, as with the conversion claim, this argument goes beyond the claim stated in the First Amended Complaint and attempts to introduce a new theory which is not in the pleadings.

■ An action for breach of contract, including breach of an insurance contract,[7] is subject to a six-year statute of limitations. Ala.Code 1975, § 6–2–34. The Alabama Supreme Court has stated that "the statute of limitations on a contract action runs from the time a breach occurs rather than from the time actual damage is sustained." *AC, Inc. v. Baker,* 622 So.2d 331, 335 (Ala.1993) (citation omitted). Because the alleged breaches

---

7. In Alabama, an insurance contract is subject to the same general rules as other contracts. *See, e.g., Hackleburg Church of Christ v. Great Am.*

*Ins. Cos., Inc.,* 675 So.2d 1309, 1311 (Ala.Civ. App.1995) (citations omitted), *cert. denied,* No. 1950365 (Ala. Mar. 8, 1996).

occurred in 1986, nine and one-half years before this action was filed, Casassa's breach of contract claim is barred by the statute of limitations. · Accordingly, summary judgment on Casassa's breach of contract claim is due to be GRANTED. ·

### D. *Count Seven—The Negligent and/or Wanton Supervision Claim*

In Count Seven of his Amended Complaint, Casassa claims that "Liberty Life negligently and/or wantonly supervised its agent[, Mercier,] such that he was allowed to participate in the fraudulent acts and schemes ... in the selling of a life insurance plan to [Casassa]."

 A negligence and/or wantonness cause of action is subject to a two-year statute of limitations. Ala.Code 1975, § 6–2–38. In Alabama, "[a] negligence [and/or wantonness] [8] cause of action accrues as soon as the plaintiff is entitled to maintain the action, i.e., at the time of the first legal injury, regardless of whether the full amount of damages is apparent." *See Long v. Jefferson County,* 623 So.2d 1130, 1137 (Ala.1993) (citations omitted).[9] As stated, Casassa testified that he was injured as early as 1986 when Liberty Life allegedly committed conversion and breach of contract. Because the alleged negligence and/or wantonness occurred nine and one-half years before this action was filed, Casassa's negligent and/or wanton supervision claim is barred by the statute of limitations. Furthermore, Casassa has come forward with no evidence to support this claim. His statement in brief that evidence will be submitted at trial is insufficient. Accordingly, summary judgment on Casassa's negligent and/or wanton supervision claim is due to be GRANTED.

8. "The statutory period of limitations for negligence and wantonness actions ...· is two years from the date the injury occurred." *Henson v. Celtic Life Ins. Co.,* 621 So.2d 1268, 1274 (Ala. 1993) (per curiam).

9. Casassa attempts to modify this accrual rule by arguing that a negligence and/or wantonness cause of action based upon the negligent and/or wanton supervision of an agent who commits fraud accrues when the plaintiff discovers or should have discovered the injury. However, the Alabama Supreme Court stated that there is "no 'discovery rule' to toll the running of the limita-

### V. *CONCLUSION*

For the foregoing reasons, Liberty Life's Motion for Summary Judgment is due to be GRANTED. A separate Order and Judgment will be entered in accordance with this Opinion.

tions period with respect to negligence or wantonness actions; the 'discovery rule' in Alabama is applicable only to fraud actions." *Henson,* 621 So.2d at 1274 (citing Ala.Code .1975, § 6–2–3).

Even if the discovery rule applied to Casassa's negligence claim, the claim would still be time-barred because, as ·discussed, Casassa should have discovered the alleged fraudulent conduct after reading the 1988 Report regarding the Policy, and this is more than two years before he filed suit.